

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-2-2005

# USA v. Lore

Precedential or Non-Precedential: Precedential

Docket No. 03-3043

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Lore" (2005). *2005 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 03-3043, 03-3217, 03-4349, 03-4350
_____

UNITED STATES OF AMERICA

v.

JOSEPH LORE,

Appellant in No. 03-3043
_____

UNITED STATES OF AMERICA

v.

DENISE BOHN,

Appellant in No. 03-3217
_____

UNITED STATES OF AMERICA

v.

JOSEPH PELLICCIA,

Appellant in No. 03-4349
_____

UNITED STATES OF AMERICA

v.

WILLIAM HURLEY,

Appellant in No. 03-4350
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 99- cr-00292-4/3/6/5)
Honorable Mary Little Cooper, District Judge

———————

Submitted under Third Circuit LAR 34.1(a)
October 28, 2005

BEFORE:  SLOVITER, FISHER, and GREENBERG, <u>Circuit</u> Judges

(Filed December 2, 2005)

———————

Marc Fernich
570 Lexington Avenue
16th Floor
New York, NY 10022

   <u>Attorney for Appellant Joseph Lore in No. 03-3043</u>


Michael P. Koribanics
Koribanics & Koribanics
685 Van Houten Avenue
Clifton, NJ 07012

   <u>Attorney for Appellant Denise Bohn in No. 03-3217</u>

Joseph Pelliccia
50 West 48th Street
Bayonne, NJ 07002

   <u>Attorney pro se in 03-4349</u>

Leonard Meyerson
Miller, Meyerson, Schwartz & Corbo
955 West Side Avenue
Jersey City, NJ 07306

   <u>Attorney for Appellant William Hurley In No. 03-4350</u>

Christopher J. Christie
United States Attorney
George S. Leone
Chief, Appeals Division
Attorneys for Appellee
David B. Lat
Assistant U.S. Attorney
970 Broad Street
Newark, NJ 07102-2535


    Attorneys for Appellee

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

## I.  INTRODUCTION

These matters come on before this court on partially consolidated appeals following convictions at a jury trial in the district court on December 17, 2001, and the subsequent entry of judgments of convictions and sentences on July 10, 2003, as to Joseph Lore, July 25, 2003, as to Denise Bohn, and October 31, 2003, as to Joseph Pelliccia and William Hurley.  The case originated on June 2, 1999, when a grand jury returned an indictment against Bohn, Eugene G'Sell and John Angelone charging them with conspiracy to embezzle funds from Local 1588 of the International Longshoremen's Association (the "union" or "Local 1588"),  contrary to the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 501(c) ("section 501(c)"), in violation of 18 U.S.C. § 371. Subsequently, a grand jury returned a superseding indictment on December 19, 2000, charging defendants-appellants, Lore, Bohn, Pelliccia and Hurley (collectively, "defendants"), along with Thomas Rackley, who is not a party on these appeals, among other things, with conspiracy to embezzle and embezzlement of funds from Local 1588. In these proceedings, defendants appeal from their convictions by challenging numerous rulings by the district court made prior to, during, and after their three-week trial that began in November 2001. Lore and Bohn, but not Pelliccia and Hurley, also challenge their sentences in light of United States v. Booker, 543 U.S. __, 125 S.Ct. 738 (2005).

3

II. FACTUAL AND PROCEDURAL HISTORY

A. The Parties and Conduct at Issue

Local 1588, which is headquartered in Bayonne, New Jersey, is a labor organization comprised of longshoremen, dockworkers and others who service the shipping industry.[1] In 1990, the government asserted that its president and secretary-treasurer, respectively Blaze Terraciano and Dominic Sanzo, had allowed organized crime elements into the union. As a result, the government initiated a civil RICO action against Local 1588 seeking to purge the union of these elements.[2] The civil RICO action culminated in a consent order by which the executive board of Local 1588 agreed, inter alia, that the union's officers and employees would not associate with Lore with regard to any union business. The order was unusual inasmuch as Lore was not an officer or member of Local 1588 but rather was the hiring agent for International Terminal Operations, a waterfront entity that employed many Local 1588 members. In that capacity Lore controlled the work assignments of many union members.

In December 1990, Local 1588 elected G'Sell and Angelone as its president and secretary-treasurer, respectively, to replace Terraciano and Sanzo, who had been implicated in the civil RICO action. Lore exerted significant influence over their election, but his influence over Local 1588 was not limited to the selection of its leadership for he exercised significant control over its payroll by directing that the union place certain individuals, including Pelliccia and Hurley, on it.

Bohn, who was Terraciano's daughter, and was involved romantically with Lore, staffed the Local 1588 office. According to Angelone, she gave herself the title "Administrator." Bohn was

---

[1]Though we set forth the facts on the basis of the testimony favorable to the government as the verdict winner, see United States v. Pungitore, 910 F.2d 1084, 1097 (3d Cir. 1990), there is no real dispute regarding some but not all of the facts we reference. In this opinion we refer to the joint appendix Bohn filed as "J.A." She also filed an addendum to her appendix, and the other defendants and the government filed additional appendices.

[2]See also United States v. Carson, 52 F.3d 1173, 1176-80 (2d Cir. 1995) (providing background information regarding Local 1588).

4

responsible for Local 1588's day-to-day financial operations, a power that she exercised to give herself complete control over its books and records. Thus, she drafted paychecks, paid bills, and conducted bank transactions for the union. Her control was so complete that she did not allow anyone else access to the union's financial records and checkbook– not even Angelone, who replaced Sanzo as Local 1588's secretary-treasurer. Bohn enjoyed numerous benefits incidental to her employment, including the use of a leased BMW, the expenses for which Local 1588, at Lore's prompting, paid. Furthermore, Bohn received a Christmas bonus in an amount of her choice. Clearly, Bohn was secure in her position for Lore successfully intervened on her behalf when Angelone suggested terminating her employment.

As we have indicated, on June 2, 1999, a grand jury returned an indictment charging G'Sell, Angelone, and Bohn with conspiring to embezzle funds from Local 1588. In particular, the indictment charged them with abusing union credit cards by improperly charging personal expenses and obtaining kickbacks from vendors and service providers who performed services for Local 1588. G'Sell and Angelone pleaded guilty to one count of the indictment pursuant to cooperating plea agreements, and, as a result, they testified on behalf of the government at the trial in this case.

In the superseding indictment returned on December 19, 2000, the grand jury charged, inter alia, that Lore, Bohn, Pelliccia, Hurley and Rackley embezzled large sums of money from Local 1588 over a period of years.[3] These defendants pleaded not guilty following which

---

[3]The superceding indictment included the following counts: Count One, against Lore, Bohn, Hurley, Pelliccia and Rackley charged a conspiracy against the victim union in violation of 18 U.S.C. § 371, contrary to section 501(c). Count Two, against Lore, charged him with making false statements to obtain worker's disability benefits under the Longshore and Harbor Workers' Compensation Act, in violation of 33 U.S.C. § 931. Count Three, against Lore and Hurley, charged a section 501(c) violation for diverted salary payments. Count Four, against Lore and Pelliccia, charged a section 501(c) violation for diverted salary payments. Count Five, against Lore and Rackley, charged a section 501(c) violation for diverted salary payments. Counts Six, Seven and Eight, against Bohn, charged section 501(c) violations in various specified amounts relating to an alleged vendor kickback scheme. All of the substantive charges (Counts Two through Eight) also charged violations of the aiding and abetting statute, 18 U.S.C. § 2.

there was a three-week trial on the superceding indictment at which the government alleged and demonstrated that they used three methods to embezzle union funds: (1) a salary diversion scheme; (2) credit card abuse; and (3) service provider kickbacks.

### B. Salary Diversion Scheme

The salary diversion scheme appears to have been defendants' most lucrative method of embezzlement. The scheme was uncomplicated but effective. To carry it out Bohn prepared paychecks for union members who were officers or employees of Local 1588, independently of and in addition to their primary employment on the waterfront. She did not, however, deliver the checks to the designated payees. Rather, in a typical case G'Sell would endorse a check with the payee's name, and G'Sell or Bohn then would take the check to a bank to be cashed. Thereafter, the cash was returned to the union hall for disbursement, where half was delivered to Lore, usually by G'Sell, and the other half went to the designated payee.

G'Sell testified that, after being elected president of Local 1588 in 1990, he understood that half of his and Angelone's salaries would be diverted to Lore. G'Sell further testified that he similarly diverted to Lore half of Pelliccia's and Hurley's salaries, along with the salaries of other persons, at various times while Local 1588 employed them. According to G'Sell, he informed each participant in the scheme of the salary diversion to Lore, and they all acquiesced. G'Sell testified that Bohn was aware of the salary diversion scheme and, on at least one occasion, helped him count the money. Even though it may seem strange that the payees would permit the diversion of such significant portions of their payments from the union, even without regard for Lore's undoubted hold over the union and the effect that that power had on the union officials, their acquiescence in the scheme is actually not so surprising when it is considered that testimony at the trial indicated that at least some of the payees performed little or no useful services for Local 1588.[4] Thus, it appears that the payees sometimes were giving up something to which they were not entitled. Therefore, in at least those instances, the union and its membership, and not the payees, could be regarded as the sole

_____

[4]Defendants claim that the payees earned their salaries so this point is disputed.

6

victims of the scheme.[5]  In total, the government alleged that Lore and his co-conspirators diverted over $750,000 from Local 1588 through the salary diversion scheme.

### C.  Credit Card Abuse

As union officers, G'Sell and Angelone obtained American Express cards for union purchases and Local 1588 paid the American Express bills.  Through the use of these cards G'Sell and Angelone incurred approximately $20,000 and $10,000, respectively, in charges unrelated to the union.  Bohn, though not issued a union credit card, also participated in the credit card abuse by using G'Sell's card.  For instance, she spent at least $11,000 in union funds on liquor and on merchandise from a music store, dispatching G'Sell to retrieve her items and to pay for them with his union credit card.  Sharon Carballo, who had been a close friend of Bohn during the time of the criminal conduct in this case, testified regarding Bohn's spending habits and stated that she witnessed Bohn use G'Sell's union credit card for purchases unrelated to Local 1588's business at a department store.

### D.  Service Provider Kickbacks

Lore, Bohn, G'Sell and Angelone orchestrated the kickback scheme with vendors and service providers.  For example, one kickback involved Jack Doris who furnished the union with apparel– hats, jackets, sweatshirts and other clothing items.  After receiving checks from Bohn for apparel, he would cash the check at a bank and return to the union hall with the kickback in cash, which he would give to Bohn or G'Sell or both.

The vendor kickback scheme also involved various renovation and construction projects at the union hall.  For instance, on several occasions the union commissioned the services of a fence company that Lore's longtime friend, Joe Toscano, owned.  In one instance, Toscano's company constructed an eight-foot fence along one side of the union hall parking lot and then constructed an identical eight-foot fence a mere three inches in front of the first.  Angelone testified that the second fence was unnecessary, and cost double the cost of the first fence.  The government alleged that Toscano substantially

---

[5]We do not suggest that our outcome turns on this point as our result would be the same regardless of whether the payees earned all, some, or none of their salaries.

overcharged the union on the fence project, and that he kicked back the overcharge to Lore. In another instance, the union hired Vito Bilotta to perform paving and roofing work. In his dealings with Local 1588, Bilotta dealt exclusively with Bohn, with whom he may have been involved romantically. She drafted weekly checks for Bilotta's services, totaling approximately $70,000, but there were no work orders or invoices supporting the expenditures. In describing Lore's influence over the construction and renovation at the union hall, Angelone recounted how Lore instructed him to cease negotiating for lower prices on union hall construction and remodeling.

### E. Proceedings in the District Court

The trial on the superceding indictment began October 9, 2001, but the court declared a mistrial the following day after certain jurors observed Lore making a threatening gesture toward the government's first witness, G'Sell. Consequently, the court selected a new jury following which the trial began again on November 7, 2001. After three weeks of testimony, the court submitted the case to the jury on December 12, 2001. The jury returned a verdict of guilty as to all defendants on all counts on December 17, 2001. Subsequently the court sentenced Lore, Bohn, Pelliccia, Hurley and Rackley to custodial terms of 70 months, 38 months, 24 months, 18 months and 13 months, respectively, followed by appropriate periods of supervised release.[6] Defendants (not including Rackley) have timely appealed. Thus, as we have indicated, Rackley is not a party to these proceedings. The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

### III. DISCUSSION[7]

---

[6]We are setting forth the net custodial terms without breaking them down to show that the sentences encompassed concurrent components.

[7]Each defendant filed a separate brief, but Lore, Bohn and Pelliccia adopted by reference the arguments of their co-defendants to the extent such arguments might be applicable to them and were not inconsistent with their own contentions.

A. Section 501(c) Convictions

1. Statutory Interpretation

Defendants raise two arguments concerning the reach of 29 U.S.C. § 501(c). They argue that the salary diversion scheme was beyond the scope of the conduct that section 501(c) prohibits, and Bohn adds that she is not within the class of persons the section covers. The district court rejected both arguments. We exercise plenary review over defendants' challenge to the district court's interpretation of 29 U.S.C. § 501(c). See United States v. Urban, 404 F.3d 754, 762 (3d Cir. 2005).

a. Conduct Covered by Section 501(c)

Lore, Pelliccia and Hurley contend that the salary diversion scheme underlying their convictions is beyond the reach of section 501(c) which provides in pertinent part:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c).[8] In United States v. Silverman, 430 F.2d 106 (2d Cir. 1970), the court explained the crime that Congress intended to establish in enacting section 501(c):

> [Congress has] gone beyond the common law offense of larceny and the old statutory crime of embezzlement because 'gaps or crevices have separated particular crimes of this general class and guilty men have

---

[8]Defendants challenge the applicability of section 501(c) to the salary diversion scheme but do not challenge its applicability to the other means underlying the conspiracy to embezzle– i.e., credit card abuse and service providers kickbacks.

escaped through the breaches,' <u>Morissette v. United States</u>, 342 U.S. 246, 271-72, 72 S.Ct. 240, 254, 96 L. Ed. 288 (1952). But, as was there held, despite minor variations in language the common thread is that the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done. . . .

It is easy to understand how a union employee does this when he 'unlawfully and willfully' uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization; the 'union' presumably would have objected if it had been able to speak freely.

<u>Id.</u> at 126-27 (internal citations omitted). As another court of appeals has explained, the broad language of section 501(c) "would seem to cover almost every kind of taking." <u>United States v. Harmon</u>, 339 F.2d 354, 357 (6th Cir. 1964); <u>see also</u> <u>United States v. Robinson</u>, 512 F.2d 491, 494 (2d Cir. 1975) ("The statutory language condemns the embezzlement or conversion not only of moneys, funds and securities, but also of 'property, or other assets of a labor organization . . . directly or indirectly. . . .'").

Defendants assert that their conduct cannot be regarded as a taking of union funds because "lawfully earned salary payments are not union funds within the scope of section 501(c)." Lore Br. at 15. The argument contends that the payments to Lore came from bona fide, authorized salaries and thus the scheme involved private transactions rather than the embezzlement of union funds. In support of this argument they cite <u>United States v. Brill</u>, 350 F.2d 171, 174 (2d Cir. 1965) (internal quotation marks omitted), for the proposition that "section 501(c) does not prohibit any union officer or employee from using his bona fide salary in any manner he or she may see fit." Lore Br. at 15; <u>see also</u> Hurley Br. at 22 ("It is axiomatic that one cannot steal, embezzle moneys from oneself."). In addition, defendants devote much space in their briefs to their assertion that Local 1588 benefitted from the salaried officials' services.

Defendants' attempts to recast the evidence, however, are unpersuasive. The government's proof established that the

10

designation of funds as "salary" was merely a clever scheme for routing union funds to Lore, who directed that the union place the payees on the payroll. Lore even controlled the amounts of what, in reality, were nominal "salaries," dictating that the union grant raises for salaried officials when he wanted to increase the amount of money diverted to him. Finally, there was no evidence that Lore, who was not a union member, much less one of its officials, provided any services or benefits to Local 1588 in exchange for the funds diverted to him.[9] In fact, the parties stipulated at trial that the consent order in the civil RICO action we discussed above barred Local 1588 from associating with Lore. But rather than heeding the consent order, it appears that Lore regarded the union treasury as a personal money access machine available for his use.

We recognize that the fraudulent scheme involved here was novel. Indeed, as the district court noted in its sentencing memorandum, "there are no reported cases in this or any circuit that involve a salary diversion embezzlement scheme similar to that perpetrated in this case." Lore App. at 30. But this is not the first time that a court has been tasked with assessing whether unconventional chicanery falls within the ambit of section 501(c). See, e.g., Robinson, 512 F.2d 491. In Robinson, a jury convicted a union official and two union employees of violating section 501(c) by converting union forms normally reserved for union members to grant them priority status in regard to promotions, and selling them to new recruits. On appeal, the court rejected the defendants' argument that they had not violated section 501(c) because the forms that they converted had no intrinsic value and the union, rather than suffering a loss, actually profited from the defendants' activities. Id. at 494-95. The court explained:

> Although appellants claim that this is a case of first impression, that is true only to the extent that the fact

---

[9]Indeed, it is rather disingenuous for defendants to assert that the salary diversion scheme was merely a series of private transactions and to decry a "narrow focus on what the Salaried Officials did with their money," Lore Br. at 20. In reality, the payees of the union's checks did not realize, possess or otherwise beneficially enjoy their salaries for, as the district court noted at a hearing on post-trial motions, the evidence demonstrated that the checks representing the diverted funds did not reach the payees but, instead, were "immediately cashed out and divvied up," with half of the salary going to Lore. J.A. at 5107-08.

11

pattern is unusual. . . . In our view, the activities of the defendants fall within [the court's] description [in Silverman] of the crime Congress intended to establish. They utilized the property of the union in a way which benefitted themselves and not the union. Their action was not authorized and presumably the [union] and its membership would have objected had it been made known.

Id. at 495-96 (citing Silverman, 430 F.2d at 126-27). Here, defendants' scheme similarly falls within the description of the crime Congress intended to establish: the diversion of hundreds of thousands of dollars in union funds disguised as "salary" was an unlawful and willful misuse of union funds "that works to the personal benefit of . . . the payee and does not benefit the union." See Silverman, 430 F.2d at 127.[10]

We also find unpersuasive defendants' assertion that they could not have violated section 501(c) because the diverted salaries were "duly authorized by the union or its president" or because the union benefitted from the services of the salaried officials. See, e.g., Hurley Br. at 21. We have recognized the "obvious problems" concomitant with any approach to section 501(c) that places too much weight on authorization and union benefit. United States v. Oliva, 46 F.3d 320, 323-24 (3d Cir. 1995). In Oliva, we explained that there is "potential for abusing" authorization by those doing the authorizing, who then are "in the strongest position to justify [conduct] as a benefit to the union in ways that are not easily disproven." Id. at 324. Instead, we held that authorization and benefit are "merely factors that may be considered as bearing on intent." Id.; accord United States v. Vandenbergen, 969 F.2d 338, 340 (7th Cir. 1992) ("We can imagine cases in which formally authorized expenditures violate section 501(c).").[11] Thus, it does not matter whether the union "went through

---

[10]We do not suggest that we predicate our result on the large amount of money involved.

[11]The Court of Appeals for the Seventh Circuit has explained that even when expenditures are authorized, the authorization is a nullity if obtained "without the disclosure of material information." United States v. Carlino, 143 F.3d 340, 344 (7th Cir. 1998). See also United States v. Butler, 954 F.2d 114, 119 (2d Cir. 1992) (affirming section 501(c) conviction and noting "[a]n authorization obtained without disclosure of

12

the form of authorization," because the union, which a district court in a consent order had enjoined permanently from even associating with Lore, "presumably would have objected if it had been able to speak freely." Silverman, 430 F.2d at 127.[12]

Accordingly, we reject defendants' construction, which elevates form over substance to allow their "escape[ ] through the breaches" of gaps and crevices which Congress sought to close with section 501(c)'s broad prohibition on pilfering union funds.

b. Persons Covered by Section 501(c)

Bohn asserts that she is not among the class of persons section 501(c) covers because she did not have a fiduciary relationship with Local 1588. We find that this argument lacks merit.

Section 501(c) does not limit its coverage to fiduciary officials and employees. Instead, the clear text covers "any person" employed by a union, without regard to any other statute setting forth fiduciary obligations of union officers. See United States v. Capanegro, 576 F.2d 973, 978 (2d Cir. 1978) ("We have heretofore affirmed the convictions under section 501(c) of defendants who held such relatively menial positions as Patrolman and Master-at-Arms of a labor organization.").[13] Neither the statutory definition of "person" nor that of "employee" references fiduciary relationships. See 29 U.S.C. § 402(d),(f). Moreover, Bohn misapprehends our opinion in Oliva, 46 F.3d 320, which she cites for her fiduciary relationship argument, because in Oliva we neither were presented with nor ruled on the issue of whether a section 501(c) violation requires a fiduciary

---

. . . material information is obviously a nullity").

[12]It is significant that, notwithstanding the purported authorizations and union benefits, the jury here concluded that defendants acted knowingly, willfully, and unlawfully, "with intent to deprive Local 1588 of the use of its funds." See J.A. at 4959. We know the jury made that finding because the district court in its charge told the jury that it had to do so to convict defendants on Counts Three through Eight, and the jury did exactly that.

[13]Though we accept the court's opinion in Capanegro, and thus rely on it, we do not join in its characterization of the positions involved as "menial."

13

relationship. We now make clear that it does not have such a requirement.

2. Sufficiency of Evidence

Bohn, Pelliccia and Hurley unsuccessfully filed post-trial motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that the government failed to adduce sufficient evidence to support their section 501(c)-related convictions. Moreover, in addition to contending in a less focused way that there was insufficient evidence to support her conspiracy conviction, Bohn argues that she was convicted solely on the basis of her association with Lore. See Bohn Br. at 26 ("Basically, the Government's case against Denise Bohn was essentially based on her relationship with Joe Lore."). Pelliccia and Hurley contend that the evidence that they had a fraudulent intent was purely circumstantial and insufficient.[14]

"The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." United States v. Serafini, 233 F.3d 759, 770 (3d Cir. 2000). In reviewing a jury verdict for sufficiency of the evidence, "we determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000) (quoting Gov't of the Virgin Islands v. Charles, 72 F.3d 401, 410 (3d Cir. 1995)). In other words, we "must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." United States v. Frorup, 963 F.2d 41, 42 (3d Cir. 1992) (citing Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1942)). Moreover, we review both direct and

---

[14]The government asserts that Hurley's and Pelliccia's section 501(c)-related arguments, "while cast as a sufficiency challenge, [are] properly viewed as presenting the same statutory interpretation as Lore's." Gov't. Br. at 21. We disagree. Although the bulk of their argument challenging the section 501(c)-related convictions mirrors the statutory argument, they also challenge the sufficiency of evidence establishing intent. See Pelliccia Br. at 3-3C (asserting "insufficient evidence" that he "knew that his actions, of giving [money] back to G'Sell . . . was furthering a crime"); Hurley Br. at 28 ("The evidence did not show knowledge and fraudulent intent."). Accordingly, we address their insufficiency claim insofar as it relates to intent.

circumstantial evidence where there are sufficiency of the evidence questions. See United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986). None of the defendants can sustain this heavy burden on the sufficiency of evidence issue.

The record is replete with evidence with regard to Bohn sufficient to support her conviction. In denying Bohn's motion for a judgment of acquittal, the district court chronicled much of the evidence establishing her guilt. This evidence included, but was not limited to, testimony linking Bohn to all three methods alleged in the conspiracy: (1) negotiating and endorsing checks associated with the salary diversion scheme, the proceeds of which she helped divide; (2) processing all inflated bills associated with the vendor kickback scheme; and (3) using a union credit card for personal use and spending union funds to purchase liquor. Thus, contrary to Bohn's contention, the jury did not convict her solely on the basis of her association with Lore. Indeed, her criminal conduct with respect to Local 1588 was uncabined and demonstrated that she had no more interest in ensuring that the union's funds were spent properly than did Lore.

Pelliccia's and Hurley's challenges to the sufficiency of evidence establishing intent, which they describe as largely circumstantial, are also devoid of merit. We have held that all the elements of a conspiracy charge, including intent and knowledge of illicit purpose, "may be proven entirely by circumstantial evidence." United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996) (internal citation omitted); see also United States v. Klein, 515 F.2d 751, 754 (3d Cir. 1975) ("Circumstantial evidence is clearly proper . . . especially in a conspiracy case where direct evidence is likely to be scant."); United States v. Stubin, 446 F.2d 457, 461 (3d Cir. 1971) (holding that circumstantial evidence may support finding of intent in a prosecution under section 501(c)). There was compelling evidence from which to infer Pellicia's and Hurley's intent and knowledge of illicit purpose, including evidence that they participated in the scheme with knowledge that half their salaries would be diverted to Lore. For example, G'Sell testified that he explained the salary diversion scheme to Pelliccia and Hurley. It does not matter that the co-conspirators did not discuss the fraudulent nature of their actions. See United States v. Anderskow, 88 F.3d 245, 254 (3d Cir. 1996).

B. Denial of Severance

15

Bohn and Hurley assert that the spillover of evidence relating to Lore and, in particular, the evidence on Count Two which charged Lore with making false statements to obtain worker's disability benefits under the Longshore and Harbor Workers' Compensation Act, in violation of 33 U.S.C. § 931, prejudiced them. This position, however, is in tension with "the fundamental principle that the federal system prefers joint trials of defendants who are indicted together because joint trials promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." United States v. Urban, 404 F.3d at 775 (quoting Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 937 (1993) (internal quotation marks omitted)). For this reason the choice of whether to sever defendants' trials rests in the sound discretion of the district courts. Accordingly, we review a district court's denial of a motion to sever for abuse of discretion. Id. A court should grant severance under Fed. R. Crim. P. 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. (citing Zafiro, 506 U.S. at 539, 113 S.Ct. at 938). Defendants seeking a severance bear a "heavy burden" and must demonstrate not only that the court would abuse its discretion if it denied severance, "but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial." Id. (internal citations and quotations omitted).

Neither Bohn nor Hurley can meet the burden to show that the district court erred under this standard. The fact that Lore may have been the only defendant the grand jury charged in connection with making a false worker's disability claim is not determinative. We see no reason why, in a joint trial of defendants charged with participating in a conspiracy, the fact that the grand jury charged one defendant separately with an additional criminal act somehow would interfere with the petite jury's ability to consider the evidence against each defendant on each count separately. See United States v. Sandini, 888 F.2d 300, 307 (3d Cir. 1989). Notably, the government's proof regarding Count Two consisted largely of testimony of G'Sell and Angelone, co-conspirators in the embezzlement scheme. In fact, there was nothing unusual in the joinder of charges and defendants in this case for, as we have recognized, "undoubtedly, there are many criminal cases in which defendants are tried together on different counts, so that all the evidence is not germane to all the counts against each defendant." Id. Indeed, the Federal Rules of Criminal Procedure in allowing joinder of defendants expressly contemplate as much:

16

"All defendants need not be charged in each count." Fed. R. Crim. P. 8(b).

Bohn and Hurley claim prejudice from the spillover of evidence portraying Lore in a more negative light than they or relating to the false accident charge, but their arguments in this regard also fail. We long have held that "a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." United States v. Somers, 496 F.2d 723, 730 (3d Cir. 1974). Instead, the relevant inquiry is "whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." United States v. Davis, 397 F.3d 173, 182 (3d Cir. 2005) (internal quotation marks omitted). In this case the false accident claim charge underlying the claim of prejudice was relatively straightforward and discrete, not involving overly technical or scientific issues. In these circumstances we do not doubt that the jury reasonably could have been expected to compartmentalize the evidence as it related to Lore and actually did so. See id. Moreover, the district court instructed the jury several times to compartmentalize the evidence by considering the evidence separately as to each defendant and each count. We presume that the jury followed the instructions, and thus we regard the instructions as "persuasive evidence that refusals to sever did not prejudice the defendant[s.]" Urban, 404 F.3d at 776 (citing United States v. Voigt, 89 F.3d 1050, 1096 (3d Cir. 1996)).

Finally, defendants do not satisfy their heavy burden by claiming that the district court abused its discretion in denying their renewed motions to sever after an incident during the trial in which certain jurors reported that Lore had walked closer to them outside of the courtroom than they would have expected. Though threats made to a juror in some instances could undermine a defendant's right to a fair and impartial trial, we have no reason to characterize Lore's conduct in walking near jurors as a threat to the jurors or to believe that it undermined defendants' right to a fair trial. In this regard we point to the district court's description of the incident:

> Several of the jurors mentioned to [the Court] today
> that they felt that Mr. Lore was walking in their
> vicinity at an uncomfortably close range. He said
> nothing to them. He did not eyeball them or anything,
> but they noticed it to the degree that they mentioned it

17

> to [the Court].  They hastened to add that they didn't
> feel anything improper had been done.  And it didn't
> affect their ability to, you know, perceive the events in
> the courtroom without bias at all.

J.A. at 4461 (emphasis added).  In denying the motion for severance, the court explained that the incident did not involve any communication, either verbal or non-verbal, and that the occurrence was the inevitable result of persons involved in the case occupying common areas, like sidewalks.  Moreover, "out of extreme caution," the court instructed defense counsel to keep their clients "in tow, at all times."  J.A. at 4487.  On this record, we cannot hold that the district court abused its discretion in denying the motions to sever.

### C.    Bohn's Fifth Amendment Challenge

Bohn contends that the district court committed reversible error in denying her two motions for mistrial based upon perceived Fifth Amendment violations stemming from two sources: (1) a statement made by the prosecution in its opening; and (2) an answer given by a witness during trial.  In this regard we observe that Bohn did not testify.  Our review of the record satisfies us that the district court properly denied the motions for mistrial.

### 1.  Statement by Prosecution

The standard of review for allegedly prejudicial comments by the prosecution in its opening statement varies depending upon whether the error is constitutional or non-constitutional.  Helbling, 209 F.3d at 241.  "If the error is non-constitutional, we will affirm when it is highly probable that the error did not contribute to the judgment"; but "if the error is constitutional, we will affirm if we find that the error is harmless beyond a reasonable doubt."  Id. (internal citations and quotations omitted).  Here we are satisfied that even under the most stringent harmless error analysis, we cannot conclude that the statement to which Bohn points in the prosecution's opening prejudiced her.  The allegedly prejudicial comment to which she points was in the prosecutor's discussion of the service provider fraud and was as follows:

> I'm going to call as witnesses two of the contractors
> [involved in the scheme], Mr. Vito Ballotta [sic] and
> Mr. Joe Toscano. Wait until you hear Joe Toscano's

18

scam. Joe Toscano has a fence company in Bayonne. Personal friend of Joe Lore's. In fact, Mr. G'Sell will tell you that he, Mr. G'Sell and his wife, Mr. Toscano and his wife and Mr. Lore and his girlfriend went out to dinner. Mr. Toscano comes onboard to put up a fence around– actually around part of the parking lot. Now again, remember what it is, 20 by 60 or 70 feet, $57,000 to put a fence. He didn't put one fence. And I'll show you photographs. He put up a fence and then was told to put up another fence three inches from it. Three inches. Chainlink fence, three inches apart. The first chainlink fence cost the Union $9,000. He put up the exact same fence three inches apart from the other one and charged them $20,000. <u>Where did the money go? They have some explaining to do.</u>

J.A. at 444 (emphasis added). Specifically, Bohn claims that the prosecutor's statement in the final sentence that we have quoted, "They have some explaining to do," violated her Fifth Amendment protections. Bohn Br. at 36-37.[15] But, as the district court explained when it denied the motion for a mistrial predicated on the statement, when the statement is considered in context it refers not to Bohn but to the contractors, Bilotta and Toscano, whom the prosecutor said he would call as witnesses. Indeed, the most natural reading of "they" at the end of this remark is to treat it as referring to the witnesses the prosecution identified at the outset of the remark, as opposed to Bohn, whom the prosecutor did not even name.

2. <u>Statement by Angelone</u>

Bohn's claim that her Fifth Amendment rights were violated when, in response to questioning by counsel for Lore about why certain checks were not supported by invoices, Angelone replied, "You'd have to ask Denise. She handled the checkbook," is similarly unavailing. J.A. at 2673. Bohn claims this remark caused the jury to perceive her as "the best person . . . to come forward to explain financial irregularities or purported criminality." Bohn Br. at 39. We

_____

[15]Bohn did not object to the statement at the time the prosecutor made it. But counsel for Lore did object, and his objection preserved the objection for all defendants inasmuch as the district court deemed "all defense counsel [to] join in every objection in every application, unless [counsel] expressly opt[ed] out." J.A. at 586.

review the denial of a motion for a mistrial based on a witness's allegedly prejudicial comments for an abuse of discretion. United States v. Xavier, 2 F.3d 1281, 1285 (3d Cir. 1993). In reviewing the denial of her motion on that standard, three factors guide our analysis: (1) whether Angelone's remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court. See id. Here, a single statement by a witness whose testimony spanned five days hardly can be deemed "pronounced and persistent," and the record contains strong evidence of the extent of Bohn's participation in the illegal schemes. Moreover, even though Bohn declined the district court's offer to issue a specific curative instruction at the time of Angelone's statement, the court subsequently instructed the jury regarding the defendants' right to refrain from testifying.

### D. Bohn's Sixth Amendment Confrontation Clause Challenge

Next Bohn claims that the district court violated her Sixth Amendment Confrontation Clause rights because it placed limitations on her cross-examination of a prosecution witness, Sharon Carballo, regarding Carballo's drug use over a decade earlier and her present recovery treatment. The Supreme Court long has recognized that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294 (1985) (per curiam) (emphasis in original). But a district court "retains wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" on cross-examination to avoid, among other things, harassment, prejudice, confusion of issues, or interrogation that is only marginally relevant or is repetitive. United States v. Mussare, 405 F.3d 161, 169 (3d Cir. 2005) (internal citation omitted). Accordingly, a court of appeals reviews limitations on cross-examination for an abuse of discretion. Id. If we determine that there was an abuse of discretion, we then must review the error to see if it is harmless. United States v. Casoni, 950 F.2d 893, 902 (3d Cir. 1991).

We are satisfied that the district court did not abuse its discretion in limiting Bohn's cross-examination of Carballo. The prosecution called Carballo to demonstrate Bohn's abuse in the use of union credit cards. In order to determine the permissible scope of cross-examination the district court allowed Bohn's counsel to

20

question Carballo at a <u>voir</u> <u>dire</u> outside of the presence of the jury. At that time Carballo explained that she was a recovering heroin addict who has been on a treatment program under the supervision of a physician and counselors. She further explained that within that program she takes methadose, a mild form of methadone that her physician prescribed. Carballo also admitted that she had used cocaine eleven years earlier and she acknowledged that she had been convicted of the offense of cocaine possession in 1989, for which she had been placed on probation. The district court ruled that the conviction could not be used on cross-examination and determined that her past drug use and present methadose treatment did not affect her demeanor, method of expression, or apparent ability to process.[16]

In reaching its conclusions the district court acted well within its discretion in limiting the scope of Bohn's cross-examination of Carballo. Moreover, the court properly adhered to its ruling in denying Bohn's counsel's subsequent attempt to impeach Carballo's account of receiving gifts of champagne from Bohn predicated on the attorney's statement that, "in his experience recovering drug users should remain alcohol-free as well as drug-free." Bohn Br. at 42-43. Considering that Carballo's past drug use and present recovery efforts had no connection to her testimony concerning Bohn's spending habits and use of union credit cards, and did not affect her credibility as a witness, the district court did not abuse its discretion by limiting the cross-examination of Carballo to exclude reference to these matters.

### E. Lore's Sixth Amendment Confrontation Clause Challenge

Lore claims that the admission and misuse of grand jury testimony of defendants Hurley and Rackley, who did not testify, violated his Sixth Amendment rights. Specifically, Lore asserts that the grand jury testimony was testimonial hearsay inadmissible under <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354 (2004). We exercise plenary review over Confrontation Clause challenges. <u>United States v. Trala</u>, 386 F.3d 536, 543 (3d Cir. 2004) (internal citation omitted). If evidence was admitted in contravention of Lore's confrontation rights, we must consider whether the error was harmless beyond a reasonable doubt. <u>See</u> <u>Lilly v. Virginia</u>, 527 U.S. 116, 140, 119 S.Ct. 1887, 1901 (1999); <u>United States v. Hinton</u>, 423 F.3d 355,

---

[16]We believe that the court was referring to processing "information" though it did not use that word.

362 (3d Cir. 2005).

The Confrontation Clause of the Sixth Amendment affords an accused the fundamental right to confront the witnesses against him. Crawford, 541 U.S. at 42, 124 S.Ct. at 1359. The central function of this right is to protect the accused from the use of ex parte examinations as evidence against him in a criminal trial. Id. at 50, 124 S.Ct. at 1363. Accordingly, the Confrontation Clause prohibits the admission of testimonial statements made by witnesses outside of court, unless the witnesses are unavailable and the defendant had a previous opportunity to cross examine him or her. Id. at 59, 124 S.Ct. at 1369; United States v. Hendricks, 395 F.3d 173, 178-79 (3d Cir. 2005).

Hurley's and Rackley's grand jury testimony was unquestionably "testimonial" within Crawford. See id. at 64, 124 S.Ct. at 1372 (listing grand jury testimony among examples of "plainly testimonial statements"). Nonetheless, a conclusion that the grand jury testimony was admitted properly is not inconsistent with Crawford. As we held in Trala, testimonial statements are admissible without prior cross-examination if they are not offered for their truth. 386 F.3d at 544 ("Crawford does not apply where the reliability of testimonial evidence is not at issue[.]"); see also Crawford, 541 U.S. at 59 n.9, 124 S.Ct. at 1369 n.9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). As the district court observed, the grand jury testimony contains self-exculpatory statements denying all wrongdoing. Thus, as in Trala, these statements "were admitted because they were so obviously false." 386 F.3d at 544-45. In addition to self-exculpatory statements, the district court described the balance of the statements as factual statements "totally innocuous as to the co-defendants based upon what's already in the record." J.A. at 5221-22.

In any event, assuming, but not deciding, that the admission of these statements violated Lore's Sixth Amendment rights, the error was harmless beyond a reasonable doubt inasmuch as there was overwhelming evidence of Lore's participation in the conspiracy. This evidence included testimony from other witnesses who set forth in convincing detail Lore's participation in the salary diversion and kickback schemes, and this testimony was corroborated independently of the challenged grand jury statements. Moreover, the questioned grand jury testimony did not name Lore, and the testimony was

22

"totally innocuous" and duplicative of other record evidence.

Finally, the district court properly instructed the jury to consider Hurley's grand jury testimony only in connection with the government's case against him and likewise to consider Rackley's grand jury testimony only with respect to the case against him.[17]  In accordance with the instruction, in summation the prosecution discussed the grand jury testimony only in the way that the court instructed the jury that it could be used.

### F.  Purported Prosecutorial Misconduct

Lore contends that he is entitled to a new trial because of the prosecutor's "pervasive . . . misconduct" during his summation and rebuttal arguments.  See Lore Br. at 40.  Specifically, Lore claims: (1) that the prosecution misrepresented the contents of a stipulation; (2) engaged in improper vouching; (3) impermissibly shifted the burden of proof to him; and (4) gratuitously attacked defense counsel.

In reviewing the statements underlying Lore's claim of prosecutorial misconduct, we are mindful of the Supreme Court's admonition that:

> a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044 (1985). Accordingly, we review the district court's ruling on any contemporaneous objections for an abuse of discretion.  United States v. Brennan, 326 F.3d 176, 182 (3d Cir. 2003).  If an appellate court finds that there has been prosecutorial misconduct, it should reverse unless the error is harmless.  Id. (citing United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)).  An error is deemed harmless if the court possesses "a sure conviction that [it] did not prejudice the defendant."  Zehrbach, 47 F.3d at 1265 (internal

---

[17]As we discussed above, the district court also instructed the jury to compartmentalize the evidence and to consider the evidence separately as to each defendant and each count.

quotation marks omitted).  "Any non-contemporaneous objections are subject to plain error review."[18]  Brennan, 326 F.3d at 182.  After our review, we find Lore's various challenges to the prosecution's summation and rebuttal unpersuasive.

    1.  Representation of Stipulation

Lore claims that the prosecution misrepresented the contents of a stipulation related to the 1990 civil RICO action that the government brought against Local 1588.  The parties agreed on the stipulation after defendants' counsel sought to impeach G'Sell and Angelone with inconsistent deposition testimony in connection with the RICO action that alleged a background of organized crime and corruption in Local 1588.  The government asserted that this impeachment opened the door to the underlying subject matter of the civil RICO action.  In lieu of evidence concerning the civil suit, the parties agreed on a stipulation which the prosecutor read to the jury.  But before the prosecutor read it, the district court explained to the jury that:

> [A stipulation] is a long word that means that the parties have agreed that a certain fact or facts exist.  So, the Government and each of the defendants have entered into this as a stipulated fact.  And you may, therefore, regard these facts that [the prosecutor] is going to read to you as proven in the case.

---

[18]Lore asserts that all instances of purported prosecutorial misconduct must be reviewed to determine if they were harmless errors because he "duly objected" to them.  Lore Br. at 41.  Though Lore provides citations to the record to demonstrate that there were contemporaneous objections for three bases to support his claim of misconduct, see J.A. at 4664 (use of stipulation), 4665-67 (shifting burden), 4903-04 (attacks on counsel), he fails to provide a reference as required by Third Circuit Local Appellate Rules to indicate "specific pages of the appendix or place in the proceedings at which [his objection to vouching] was raised, objected to and ruled upon."  3d Cir. L.A.R. 28.1.  Nevertheless, while a non-contemporaneous objection is reviewed for plain error, Brennan, 326 F.3d at 182, thus suggesting that we should use two different standards of review on the misconduct claim, in reality the standard of review makes no difference in this case for the vouching claim fails under either standard.

J.A. at 3735. The prosecutor then read the following stipulation to the jury:

> The parties hereby stipulate in 1992 and thereafter, the Executive Board of Local 1588 agreed with the Federal Government that the officers and employees of the Local were not permitted to associate with Joseph Lore who was neither a member nor an employee of the Local with regard to any business of the Local. The Board further agreed that it would not prohibit purely social contact between Denise Bohn, who was then an employee of the Local[,] and Mr. Lore. As long as that contact did not occur in or about the waterfront, including the Local's offices.

J.A. at 3735-36. Defendants aggressively cross examined G'Sell concerning his prior deposition testimony in the civil RICO litigation in which he denied that Lore had been involved in the affairs of Local 1588. At trial, G'Sell explained that he lied during his depositions to protect Lore.

Lore moved for a mistrial based on the prosecution's representation in summation that the stipulation supported the inference that Lore had been involved in the affairs of Local 1588. This challenge lacks merit. As the court explained to the jury, it could regard the facts contained in the stipulation "as proven in the case." Defendants do not point to limitations that the parties placed on the stipulation. Absent limitations, it was not improper for the prosecution to draw fair inferences from the stipulation. United States v. Sullivan, 803 F.2d 87, 91 (3d Cir. 1986) ("[T]he prosecution may ask the jury to draw permissible inferences from anything that appears in the record.") (internal quotation marks and citation omitted). It was reasonable and permissible to infer that Lore's participation in the affairs of Local 1588 precipitated its agreement with the government to bar Lore from its affairs. Moreover, even if there had been an error stemming from the prosecutor's argument, it would have been harmless under even the most exacting standard in light of the extensive testimony that defendants elicited from G'Sell that he lied in connection with the civil RICO investigation to obscure Lore's involvement in union affairs.

Lore also challenges certain remarks from the rebuttal summation relating to the stipulation. However, contrary to Lore's

argument, it does not appear that any defendant contemporaneously objected to the purported misrepresentations he now cites in his brief. Accordingly, we review these comments for plain error. Brennan, 326 F.3d at 182 ("Any non-contemporaneous objections are subject to plain error review."). Our review of these remarks in the context of the full trial does not reveal "egregious error or a manifest miscarriage of justice" necessary to support a finding of plain error, or indeed any error at all, warranting a new trial. Rather, as with its original summation remarks, the prosecution was asking the jury to draw inferences from the stipulated facts in evidence that were entered without limitation.

### 2. Vouching

Lore submits that the prosecution improperly vouched for the credibility of the government's key witnesses, G'Sell and Angelone. A prosecutor improperly vouches when he (1) assures the jury that the testimony of a government witness is credible, and (2) he bases his assurance on either his claimed personal knowledge or other information not contained in the record. Brennan, 326 F.3d at 183 (citing United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998)). But when we determine whether statements to the jury improperly vouched for a witness's credibility we consider them in the context in which they were given. Id. at 186. In the context of this case we conclude that the challenged remarks did not constitute improper vouching.

The first statement to which Lore points arose during the prosecution's summation. The prosecutor framed his comment as a response to a "particular remark" made by the defense in its opening that the prosecutor perceived as suggesting impropriety in using G'Sell and Angelone as prosecution witnesses:

> And I suggest to you, ladies and gentlemen, that that particular remark indicates that not only – not the Government is stupid, but the Government was corrupt in putting up these witnesses just to win the case.
>
> So corrupt or stupid or both, in order to win, would the Government suborn perjury? Or am I simply stupid because I didn't bother to corroborate what Mr. G'Sell said in any of his disclosure of this story or bother to check on the story that Mr. Angelone told subsequent

26

to Mr. G'Sell?  <u>But as we go along, ladies and gentlemen, you'll see that not only was the story that Mr. G'Sell told with regard to this embezzlement corroborated by Mr. Angelone, but it was also corroborated by other witnesses, other documentation and other physical evidence.  And that the case was presented to you not as a collection of lies, perjured testimony and fabricated documents, but in fact was simply the truth based upon the testimony and based upon the evidence that was presented</u>.

J.A. at 4676-77 (emphasis added).  Although the prosecutor asked rhetorical questions implying that he would not suborn perjury and that G'Sell was credible, he did not base his assurance on claimed personal knowledge or evidence outside the record.  On the contrary, following the rhetorical question the prosecutor explained that he based his assertion on the evidence of record, namely "corroborat[ion] by Mr. Angelone . . . [and] by other witnesses, other documentation and other physical evidence."  Rather than invoke information not contained in the record, the prosecutor urged the jury to consider "the evidence that was presented."

Lore also points to selected references by the prosecution to the fact that the government had subpoenaed business records of Local 1588 prior to G'Sell's cooperation, thus eliminating any opportunity to fashion his testimony to the business records.  Notably, as the district court explained, the fact that the government had obtained business records by subpoena was before the jury.  Viewed in context, these comments amounted to nothing more than an attempt to dismiss the suggestion that G'Sell could have fabricated the version of events that he recounted at trial, particularly because his version of events was consistent with the documentary evidence the government obtained through its subpoena.  Moreover, throughout the comments Lore cites, the prosecutor referenced the corroborating evidence of record.  Overall, there was no suggestion in the prosecutor's comments that he had material personal knowledge or other information not contained in the record.

Finally, Lore points to the prosecution's comment that "[S]tupid or not, the Government might like blind squirrel [sic] might have found a flaw in [G'Sell's version of events], maybe over the course of seven or eight years."  Lore Br. at 52 (citing J.A. at 4680).  But considered in context, this statement merely called attention to the

absence of evidence contradicting G'Sell's version of events and to the intricacies of the testimony that he was incapable of fabricating. It is significant that the prosecutor followed immediately with specific examples drawn from the evidence relating to the participation of the co-defendants to buttress the notion that G'Sell was incapable of fabricating the particulars of the conspiracy. Thus, considering that defendants vigorously challenged G'Sell's and Angelone's testimony, the prosecutor's remarks should be understood as an argument that any suggestion that G'Sell was lying was not supported by the evidence of record– an argument that does not amount to vouching. See United States v. Walker, 155 F.3d at 187 ("A prosecutor may argue in the negative that the assertions made by defense counsel that a witness is lying are not supported by the testimony in the record.").

### 3. Shifting Burden of Proof

According to Lore, the prosecutor impermissibly shifted the burden of proof to the defense in his summation by stating that "the defense has several dilemmas that they are burdened with here" and referring to various "dilemmas" the defendants faced after the presentation of evidence. This argument lacks merit. As we have explained, there is nothing improper about a prosecutor "attempt[ing] to focus the jury's attention on holes in the defense's theory." United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996). "Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence." Id. Such is the case here– the prosecutor's references to "dilemmas" that "burdened" the defense were attempts to focus the jury's attention on perceived deficiencies in the defendants' theory in light of the evidence presented at trial. Accordingly, the district court did not abuse its discretion in rejecting this challenge.

### 4. Attack on Defense Counsel

Lore contends that the prosecutor made a "gratuitous personal attack" on defense counsel by posing a rhetorical question during rebuttal summation asking whether the cross-examination of G'Sell was "disingenuous" or "clever lawyering." Lore Br. at 55-57. Though personal attacks on the character of defense counsel in some instances can rise to the level of misconduct, the single remark here regarding defense tactics falls far short of that level. See United States v. Millar, 79 F.3d 338, 343-44 (2d Cir. 1996) (holding that

28

prosecution's reference to defense as "hog wash" and a "smoke screen" did not warrant new trial); United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995) (holding that there was no error in permitting prosecution comments that defense was devaluing the victim and "dirtying up" witnesses); United States v. Hartmann, 958 F.2d 774, 785 (7th Cir. 1992) (holding that there was no error in allowing prosecution remark that defense told a "whopper" and tried to mislead the jury); cf. United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990) (holding that it was plainly improper for prosecutor to remark, "[w]hile some people . . . prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees"). Hartmann is particularly instructive for, as the Court of Appeals for the Seventh Circuit has explained, there is a distinction between comments directed at the tactics and arguments advanced by defense counsel and those aimed at the character of the attorneys themselves, with nothing inherently improper about the former. See Hartmann, 958 F.2d at 785. Our review of the transcript convinces us that the comments at issue here amount to the former.

Moreover, when Lore's counsel's earlier remarks are considered, it is evident that the prosecutor's summation demonstrates that "the prosecution was only meeting the defense on a level of the defense's own choosing." United States v. LaSorsa, 480 F.2d 522, 526 (2d Cir. 1973). After all, prior to the rebuttal summation he now challenges, counsel for Lore implied that the prosecution may have suborned perjury or willfully permitted the prosecution witnesses to testify falsely. See Supp. App. at 88-89 ("This idea of suborning perjury . . . ."). In this context, the prosecution's criticism of defense tactics appears to be more of a defensive response rather than an affirmative attack. See United States v. Pungitore, 910 F.2d 1084, 1126-27 (3d Cir. 1990) (explaining the "invited response doctrine," whereby "a prosecutor may neutralize improper defense arguments but may not rely on them as a 'springboard' for the launching of affirmative attacks upon the defendants."). Thus, the remark about "disingenuous" or "clever" lawyering– mildly inappropriate, at worst– does not rise to the level of severity sufficient to require reversal.

G. Sentencing Challenges

The district court sentenced the defendants prior to the Supreme Court's decision in United States v. Booker, 543 U.S. __ , 125 S.Ct. 738, holding that mandatory enhancement of a sentence

under the Sentencing Guidelines based on facts found by the court alone, in the absence of a waiver of a jury trial, violates the Sixth Amendment. Id. at __, 125 S.Ct. at 756. To remedy the constitutional infirmity of the Guidelines, the Court severed that portion of the statute making application of the Guidelines mandatory, rendering them effectively advisory. Id. at __, 125 S.Ct. at 764. Bohn and Lore challenge their sentences in light of Booker. The government does not oppose Bohn's challenge but contends that we should not vacate Lore's sentence because "the District Court offered an alternative sentencing rationale, in which it expressly stated its intention to achieve the same Guidelines range through a different analysis." Gov't Br. at 85.

The government, however, overstates the district court's "alternative sentencing rationale." While the district court offered an alternative to its loss calculation, the government points to nothing that suggests that it contemplated a framework that was advisory rather than mandatory. Nor are we able to "ascertain whether the District Court would have imposed a greater or lesser sentence under an advisory framework," and therefore prejudice in a plain error analysis "can be presumed." See United States v. Davis, 407 F.3d 162, 164-65 (3d Cir. 2005) (en banc). Moreover, notwithstanding the alternative to the loss calculation, the problem of enhancements based upon facts found by the district court by a preponderance of the evidence still remains. See Lore App. at 267-77 (district court imposing enhancement for obstruction of justice based upon a preponderance of the evidence).

Inasmuch as we have concluded that sentencing issues that arise in light of Booker best are determined by the district court in the first instance, Davis, 407 F.3d at 165-66, we are satisfied that the district court should resentence Bohn and Lore. The district court, however, need not resentence Pelliccia or Hurley as neither challenges his sentence.

IV. CONCLUSION

For the foregoing reasons, we will affirm the judgments of conviction and sentence of Pelliccia and Hurley and will affirm the judgments of conviction of Lore and Bohn, but we will vacate the sentences imposed on them and will remand their cases to the district court for resentencing.