**UNITED STATES of America**

**v.**

**Eugene SULLIVAN, Appellant.**

**No. 86–1137.**

United States Court of Appeals, Third Circuit.

Argued Sept. 19, 1986.

Decided Oct. 8, 1986.

F. Emmett Fitzpatrick (Argued), Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Michael R. Lazerwitz (Argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before ADAMS, STAPLETON, and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Eugene Sullivan appeals on various grounds from a decision of the District Court for the Eastern District of Pennsylvania finding him guilty of one count of conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, and fourteen counts of specific violations of that Act. The violations in question occurred between March 1980 and September 1983, when Sullivan commanded the Northeast Division of the Philadelphia Police Department. As division commander, Sullivan personally directed a vice lieutenant and an eight-member vice squad responsible for policing illegal gambling and prostitution within the division's boundaries. According to the jury, Sullivan headed a conspiracy among the members of the Northeast Division vice squad to extort money from owners and operators of illegal gambling and houses of prostitution in exchange for police protection.

### I.

In March 1980, Sullivan assumed command of the Northeast Division. At Sullivan's request, Lt. Walter McDermott and Officer George Bowie were transferred to his vice squad from the Eastern Division. During their service in the Eastern Division, McDermott and Bowie had actively participated in an organized extortion scheme.

At trial, Bowie testified that the Northeast extortion ring was structured to insulate Sullivan, who supervised the operation. Bowie was the "chief bagman" for two years, routinely collecting at least $10,000 in cash each month from the various vice operators who had agreed to pay for protection. Bowie reported each month's collection to McDermott, who divided up the proceeds: $4,000 for Sullivan, $2,000 for McDermott, $1,000 for Bowie, and $650 for each of the squad members. In 1982, Bowie and McDermott left the division, but their places were taken by Thomas Volkman, William Maahs and Lt. Bowman, and the extortion ring continued to operate until terminated by the federal investigation.

According to the testimony at trial, on a number of occasions Sullivan personally involved himself with screening vice operators for acceptance of protection money. On one occasion, Sullivan instructed Maahs to "leave [Lester Barry's] machines alone" when Sullivan realized that Barry had been making monthly protection payments to the squad. Moreover, Bowie testified that the cash received from Robert Sadowl, the

owner of one of the largest collections of illegal video poker machines in Philadelphia, was not "cut up with the squad" because it belonged "strictly" to Sullivan. The money from Sadowl alone ranged from $300 to $800 per month.

On August 8, 1985, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 30–count indictment against Sullivan, as well as McDermott, Maahs, John Czman and Robert Schwartz, for violations of the Hobbs Act, 18 U.S.C. § 1951. After a jury trial, Sullivan was convicted of one count of conspiring to extort, and fourteen specific counts of extortion. He was sentenced to 15 concurrent terms of 13 years' imprisonment, and fines totalling $105,000 were imposed on him. The district court suspended execution of the sentence pending this appeal.

Sullivan now raises five objections to his conviction that merit discussion.

## II.

### A. *The District Court's Exclusion of the Ten State Court Judges as Character Witnesses*

Sullivan sought to call at trial some 61 character witnesses, including ten Pennsylvania state court judges, to attest to his reputation in the community. Rule 1701 of the Pennsylvania Rules of Judicial Administration requires judges to apply for permission from the State Supreme Court before appearing as character witnesses. In accordance with this rule, the judges in question filed a petition to appear on Sullivan's behalf, but the petition was denied by the Pennsylvania Supreme Court on November 8, 1985. In spite of this ruling the district court allowed Sullivan to issue subpoenas to the ten judges, declaring that the sixth amendment gives every defendant the right to subpoena anyone he chooses. At trial, however, the district court directed Sullivan to call all non-judicial character witnesses before calling any judicial character witnesses. In connection with this ruling, Judge Cahn gave the following guidance to Sullivan's counsel:

I think I have to see how this goes. I want to see where your … examination is going to go. But we won't let the character witnesses go on, these are the broad guidelines. We certainly won't devote more than several hours to it at a maximum. Depending on the extent of the character testimony before we get to the Judges, we may not allow the Judges, because it would tend to be cumulative. I'll take an offer of proof from you as to what the Judges would add to what you already presented.

App. 1079a–1080a. Despite this suggestion, counsel presented 51 non-judicial character witnesses before calling the first judge. The district court then requested for an offer of proof as to what the ten judicial witnesses would testify; counsel informed the court that each would be asked the same question regarding Sullivan's reputation for truth and veracity that had been addressed to the preceding witnesses. The court prohibited Sullivan from calling the judges on the ground that their testimony would be cumulative.

■ Sullivan contends that the district court abused its discretion in forcing the defense to present all non-judicial character witnesses first, and then excluding the judges' testimony as cumulative. Sullivan notes that the prosecution consumed at least five full days, while his character witnesses took up only one morning session, so that the judges' testimony would not have delayed unduly the proceedings. But in determining whether exclusion of testimony infringes the sixth amendment right to due process in the type of situation we have here, the operative question is not how much time the testimony would consume, but whether the testimony would be cumulative. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982). Sullivan provides no evidence to refute the district court's conclusion that the judges' testimony would have duplicated that of the 51 character witnesses allowed to appear. Instead, his counsel argues that the district court's order that non-judicial witnesses appear first, combined with its determination

that the judges' testimony would be cumulative, had the effect of limiting his right to call relevant and favorable witnesses.

■ The Supreme Court has recognized, however, that the trial court has discretion as to the order in which parties adduce proof:

> The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof: his determination will be reviewed only for abuse of discretion.

*Geders v. U.S.*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1975). We cannot say that the district court abused its discretion in ordering that the non-judicial witnesses appear first. Because there has been no showing that the judges' testimony would have added anything of substance to the character endorsements already admitted by the district court, there was no abuse of discretion in determining that the testimony by the judges would be cumulative.

### B. *The Sufficiency of the Evidence*

Sullivan argues that the prosecution did not elicit sufficient evidence to show that Sullivan knowingly joined the conspiracy, or that an overt act was committed in furtherance of the conspiracy. In reviewing the record for sufficiency, this Court must determine whether "there is substantial evidence viewed in the light most favorable to the Government, to uphold the jury's decision." *United States v. Camiel*, 689 F.2d 31, 35–36 (3d Cir.1982).

■ A careful review of the evidence set forth at trial shows that Sullivan's contention is without merit. There was sufficient evidence to conclude, for example: that Sullivan met with Sadowl, a video poker machine kingpin, and personally arranged cash payoffs in exchange for protection from Sullivan's vice squad; that Sullivan personally approved the entry of other vice operators, such as Arnold Arnovitz, Daniel Buckley, and John Catagnus, into the

squad's extortion ring; that on another occasion, Sullivan approved the squad's returning confiscated video poker machines to their owner, Alan Simons, in exchange for Simons's agreeing to pay protection payoffs in the future; that Sullivan made certain that video poker machines belonging to his friend John Kellis were protected; that Sullivan not only accepted cash payoffs from Kellis, but also directed two of his vice officers, Thomas Volkmar and John Czmar, to take steps to ensure that Kellis's machines were not confiscated; and that Sullivan received monthly cash shares of up to $4,000.00 for overseeing the extortion operation.

### C. *Admission of Testimony Concerning Prior Tax Returns and Disclosure Forms*

During cross-examination, the prosecution questioned Sullivan about the accuracy of federal income tax forms and financial disclosure forms he had filed. Sullivan maintains that these were collateral matters not raised during direct examination, and therefore inadmissible as evidence.

■ In the federal courts, the scope of cross-examination permitted is set forth in Federal Rule of Evidence 611(b): "Cross-examination should be limited to the subject matter of the direct examination *and matters affecting the credibility of the witness.*" (emphasis added). Similarly, Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning his character for truthfulness or untruthfulness....

The government contends that Sullivan's fraudulent replies on the forms in question were probative of his truthfulness and therefore admissible. *See United States v. Zandi*, 769 F.2d 229, 236 (4th Cir.1985)

(failure to disclose income on income tax and financial forms probative of truthfulness and admissible); *Carter v. Hewitt,* 617 F.2d 961 (3d Cir.1980) (where witness concedes alleged acts, they can be used to impeach credibility in cross-examination, even if otherwise extrinsic). As the prosecution points out, Sullivan's direct testimony raised the issue of his credibility to the jury. Sullivan's credibility was in fact the central issue litigated in the case, as the defense presented only Sullivan and the character witnesses during its portion of the trial. The defendant was prepared to stand or fall on the credibility of his own testimony, as supported by character witnesses. Thus it was not error for the district court to allow the prosecution to attack Sullivan's credibility.

**D.** *The Prosecution's Comment Concerning the Northeast Division Arrest Book and Sullivan's Financial Records*

During the trial, one of Sullivan's co-defendants elicited testimony concerning the date of certain arrests from a bound Northeast Division arrest book. Although only one page from the book was referred to in testimony, the entire book was admitted into evidence without objection. The prosecution also subpoenaed certain financial records of Sullivan. Sullivan stipulated to the authenticity of these records, and was cross-examined about some of them, but no other testimony was heard about them. In its rebuttal, the prosecution referred to both the arrest book and the financial records, and Sullivan's counsel objected to these items for the first time.

■ Sullivan claims that admission of the arrest book and the other records without any testimony regarding them was error, compounded by references to both the arrest book and the other records in closing argument. But Sullivan cites no authority to support his proposition. He did not object to the admission of the arrest book into evidence until after the book was referred to by the prosecution in its closing argument; thus he has no standing to challenge

its admission here. Not only were the financial records in question stipulated to be authentic, but they were introduced after Sullivan answered questions about them during cross-examination. Therefore, Sullivan's objection "that those things have never been referred to by anybody" is mistaken. Once a piece of evidence has been properly admitted, reference to it cannot be error, because the prosecution may "ask the jury to draw permissible inferences from anything that appears in the record." *Oliver v. Zimmerman,* 720 F.2d 766, 770 (3d Cir.1983) (*per curiam*), *cert. denied,* 465 U.S. 1033, 104 S.Ct. 1302, 79 L.Ed.2d 701 (1984).

**E.** *The Jury Instructions on Extortion*

In its instructions to the jury, the district court stated that extortion may be established by the receipt of money under color of office. In doing so, it rejected Sullivan's request for an instruction that extortion may be based only on a finding that property was obtained from another whose consent was induced by wrongful use of actual or threatened force, violence or fear. Sullivan contends that the trial court erred in failing to give this instruction, and in giving the instruction on receipt of money under color of office.

■ As Sullivan concedes, however, the rule for extortion is not as set forth in his suggested instructions, but as in the court's actual instructions. In this Circuit, extortion may be established by the receipt of money under color of office. *United States v. Jannotti,* 673 F.2d 578, 594–96 (3d Cir.1982). This Court pointed out in *Jannotti* that a requirement of force, threats or use of fear to distinguish extortion from bribery is not required where public officials are involved. Such a distinction is "not in keeping with the legislative intent" in passing the Hobbs Act. *Jannotti* 673 F.2d at 595.

### III.

For the foregoing reasons, the judgment of the district court will be affirmed.