**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 06-4527, 06-4647, & 07-1229
_____

UNITED STATES OF AMERICA

v.

LARRY LEWIS FERGUSON,

Appellant at No. 06-4527,

ROSCOE B. THOMPSON,

Appellant at No. 06-4647,

DANIEL KEITH MATTHEWS,

Appellant at No. 07-1229.
_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(Crim. No. 03-72)
District Judge:  Honorable Joy Flowers Conti

Submitted Under Third Circuit LAR 34.1(a)
September 30, 2009

Before:  McKEE, Chief Judge, CHAGARES, and NYGAARD, Circuit Judges.

(Filed: September 21, 2010)

_____

OPINION
_____

CHAGARES, Circuit Judge.

Larry Lewis Ferguson, Roscoe B. Thompson, and Daniel Keith Matthews appeal various aspects of their convictions and sentences. We will affirm in all respects.

## I. Background

We write for the parties' benefit and therefore set forth only those facts essential to our analysis. Because these appeals come to us following a jury's guilty verdict, we recite the facts in the light most favorable to the Government.

### A. Ferguson

Michael Good ran a Pittsburgh-area drug-dealing operation, and Ferguson was one of his associates. In 2002, authorities learned of Good's drug ring and began to infiltrate it. They placed a wiretap on two of Good's cellular phones and intercepted multiple conversations between Good and Ferguson arranging heroin buys. They set up surveillance and observed Ferguson conduct further drug transactions.

One such deal occurred on January 23, 2003. On that day, authorities tracked Ferguson and Good to a local restaurant and waited for Ferguson to exit. Ferguson entered a vehicle and attempted to drive off, but was stopped by the police. Immediately thereafter, and before the officers approached the car, Ferguson transferred some heroin he was hiding in the driver's-side door to the car's center console. The officers approached, searched the car after obtaining Ferguson's consent, and ultimately found the heroin in the center console.

2

## B.  Thompson

Based on the wiretaps and police surveillance of Good and his associates, the Government learned that on several occasions Good and his half-brother, Thompson, completed drug deals involving heroin and crack-cocaine.  Between late 2002 and early 2003, Thompson regularly distributed to others the drugs he obtained from Good.  On New Year's Eve, 2002, Thompson gave Government witness Sherri Hunter some crack-cocaine that Good had given to him.  An arrest warrant was issued for Thompson in February 2003, and he was ultimately apprehended in Maryland.  Unbeknownst to Thompson, Good had been engaged in a sexual relationship with Thompson's daughter, Monique Means, before his (Good's) arrest.

## C.  Matthews

Matthews (also known as "Pumpkin") was another trusted drug associate of Good.  One of the cellular telephones for which the Government obtained authorization to conduct surveillance was registered to Matthews.  Based on its surveillance, the Government learned that many of Good's heroin deals took place in Matthews's mother's house.  Matthews himself was present for many of these deals.  Additionally, when he was out of town, Good would provide Matthews heroin to distribute on his behalf; in return, Good would allow Matthews to choose between cash or heroin as payment.  Matthews was arrested for this role in the drug conspiracy in February 2003.

D.  Procedural History

A federal grand jury sitting in the Western District of Pennsylvania indicted

Ferguson, Thompson, and Matthews for, inter alia, conspiracy to distribute and possess

with intent to distribute at least 100 grams of heroin (the "heroin conspiracy"), in

violation of 21 U.S.C. § 846, as well as substantive counts of possession with intent to

distribute of heroin, in violation of § 841(a)(1).  Thompson was also charged with

conspiracy to distribute and possess with intent to distribute 50 grams or more of crack

cocaine (the "crack-cocaine conspiracy"), in violation of 21 U.S.C. § 846, as well as

substantive counts of possession with intent to distribute crack cocaine, in violation of 21

U.S.C. § 841(a)(1).  After a mistrial for reasons not relevant here, the three defendants

were retried, convicted, and sentenced.  The District Court sentenced Ferguson to 360

months in prison, Thompson to 240 months in prison, and Matthews to 120 months in

prison.  These appeals followed and were consolidated for disposition.[1]

## II.  Sufficiency of the Evidence

The appellants first challenge the sufficiency of the evidence presented at trial.[2]

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

[2] Because Ferguson properly preserved his claim, we review the District Court's denial of his post-trial motions for judgment of acquittal de novo, using the same standard it should have used.  That is, we will sustain the verdicts if, viewing the evidence in the light most favorable to the Government, there was adduced "substantial evidence" such that "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  Because Thompson and

4

A.  Heroin Conspiracy

Ferguson and Matthews argue that the evidence was insufficient to support their convictions for participation in the heroin conspiracy.[3]  Ferguson argues that the evidence presented at trial failed to demonstrate that he shared with his alleged co-conspirators the intent to distribute heroin, but merely demonstrated that he occasionally purchased heroin for personal use.  Matthews similarly argues that the evidence demonstrated nothing more than that he was a heroin customer of Good's.

The elements of conspiracy are "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense."  United States v. Brodie, 403 F.3d 123, 134 (3d

---

Matthews did not properly move under Fed. R. Crim. P. 29, their sufficiency-of-the-evidence claims are not preserved, and we thus review them for plain error.  See United States v. Gaydos, 108 F.3d 505, 509 (3d Cir. 1997) (where the defendant does not preserve insufficiency issue by filing a timely motion for a judgment of acquittal, sufficiency of the evidence is reviewed under a plain error standard).

[3] Thompson also argues in passing that the evidence was insufficient to sustain his participation in the heroin conspiracy.  We reject out of hand his sufficiency-of-the-evidence challenge with respect to the heroin conspiracy.  Aside from a threadbare statement that the "evidence in this case was [in]sufficient to convict him of either of the two conspiracies charged," and a one-sentence footnote complaining about the District Court's evidentiary rulings, Ferguson Br. at 35, 40 n.5, Thompson provides no specific argument as to why the evidence actually admitted at trial was insufficient to allow a jury to conclude that he was a member of the heroin conspiracy.  He has thus waived the issue.  See United States v. Demichael, 461 F.3d 414, 417 (3d Cir. 2006) (citing Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.")).  Having reviewed the evidence in any event, we find Thompson's sufficiency challenge baseless.

5

Cir. 2005) (quoting United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986)). Thus, "[o]ne of the requisite elements the government must show in a conspiracy case is that the alleged conspirators share a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward that goal." United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004) (quoting United States v. Wexler, 838 F.3d 88, 90-91 (3d Cir. 1988)). In addition,

> even in situations where the defendant knew he was engaged in illicit activity, and knew that "some form of contraband" was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy.

United States v. Idowu, 157 F.3d 265, 266-67 (3d Cir. 1998). Factors bearing on whether a conspiracy has been shown are "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust." United States v. Gibbs, 190 F.3d 188, 199 (3d Cir. 1999) (citation omitted).

The evidence presented at trial, taken in the light most favorable to the Government, allowed a rational jury to conclude beyond a reasonable doubt that Ferguson shared the same goal (i.e., distributing heroin) as the other conspirators. For example, the jury heard testimony that Ferguson told Good that the heroin Good had sold to him had thereafter been sold to a third party, and that he intended to buy more heroin from Good in the future to furnish to that same buyer. Appendix ("App.") 1126-27. The jury also

6

heard testimony concerning Ferguson's heroin sales techniques. App. 2409-10. And the jury heard testimony that Ferguson purchased heroin from Good in quantities greater than "personal use amounts." App. 1843. This evidence easily passes muster.

Matthews's argument – that the evidence supported only a conclusion that he was merely a heroin customer – likewise fails. Good testified that on at least two occasions, he left heroin with Thompson for him to sell to Gary Sloan. After the jury listened to a January 11, 2003 telephone call between Good and Sloan, Good testified as follows:

Q.   Mr. Good, . . . [w]ho are you talking with during that call?

A.   Gary Sloan.

Q.   What were you talking about?

A.   I told him that – because he was calling me to get some more heroin, I told him to go see Pumpkin because I already gave it to Pumpkin to – for Gary and his brother to come get because I wasn't going to be around.

Q.   What had you given to Pumpkin?

A.   I gave him some heroin.

Q.   Do you recall how much?

A.   If that was the first time, it was 20 bricks. If that was the second time, it was 40 bricks.

Q.   You're talking about two different times. What are you referring to?

A.   Heroin.

Q.   But in terms of first time or second time, what do you mean by that?

7

A.   Because the first time I gave [Matthews] some, I only gave him 20 bricks to see can he handle that and do the right thing with it. And he did. Second time, I gave him 40 bricks of heroin.

Q.   When you said, can he handle that, do the right thing, what are you talking about?

A.   Sell it to Gary and then pay me my money.

App. 1374-75. This testimony, viewed in a light most favorable to the Government, easily undermines Matthews's argument that he was a mere purchaser of personal-consumption heroin. Good's testimony demonstrates that Matthews played a pivotal role in distributing heroin within the organization. Moreover, the record is replete with testimony and other evidence that many of the drug deals within the Good conspiracy took place at Matthews's mother's residence, that Matthews registered one of Good's cellular phones in his own name, and that Good and Matthews shared a close personal friendship. The evidence presented at trial was more than sufficient to permit a rational trier of fact to conclude that Matthews shared a unity of purpose with the other conspirators to distribute heroin and entered into an agreement to further that objective.

The evidence was sufficient, we conclude, to support the appellants' convictions on the heroin conspiracy charges.

### B. Crack-Cocaine Conspiracy

Thompson argues that the evidence presented at trial was insufficient to support his conviction for participating in the crack-cocaine conspiracy. Specifically, he argues that the only evidence relating to his participation in a crack-cocaine conspiracy was: (1)

8

Sherri Hunter's testimony that on one occasion Thompson gave her crack-cocaine provided by Good; and (2) Good's "generic testimony" concerning his relationship with Thompson, during which Good had difficulty describing whether his calls pertained specifically to crack-cocaine. Thompson Br. at 35-40. This evidence, he says, is insufficient to support his conviction. We discern no plain error.

Thompson vigorously asserts that Hunter's testimony at most proves that on a single occasion he did Good a favor by passing crack-cocaine to Hunter. We need not determine whether this "favor" was sufficient by itself to sustain Thompson's conviction, for the record amply supports Thompson's agreement with Good to sell crack-cocaine to others. Good testified as follows:

> Q. Mr. Good, you told us that you also were getting rid of crack cocaine. Who was involved with you in terms of you giving crack cocaine to them to get rid of?
>
> A. Who was involved?
>
> Q. Yes.
>
> A. That helped me sell the crack cocaine?
>
> Q. Yes.
>
> A. My brother Roscoe; Sherri Hunter; Percy Travillon; James Bivens. There was quite a few of them.

App. 1067. He continued:

> Q. You told us that Roscoe Thompson was involved with you in the heroin and in the crack cocaine.

9

. . .

Q.  In terms of crack cocaine, what kind of quantities of crack cocaine was your brother getting from you?

A.  He was just getting an ounce at a time. The most he would get . . . would be two ounces.

Q.  How often?

A.  [D]epends how fast he got rid of it, how his business was going. Sometimes he would – sometimes it would take him a couple weeks.

Q.  What was the arrangement in terms of payment?

A.  When he get done selling it, he would pay me.

Q.  How much would you charge Roscoe Thompson for one ounce of crack cocaine?

A.  $900.

. . .

Q.  Did Roscoe Thompson ever tell you who he sold crack cocaine to?

A.  Only one particular person one time, I happened to drive – I was coming over there one day and I saw one particular person, who was Sammy Tucker, this guy from the West End, a guy I knew, but he was selling to people in the neighborhood . . . also.

Q.  Did your brother ever tell you where he went to sell the crack cocaine?

A.  He was hitting the bar sometimes or he would sell it wherever he was at. Sometimes he would sit – he was at his girlfriend's house, he used to sit down at Manchester and sell it there too.

App. 1080-83. Aside from Good's testimony, Hunter testified about an occasion other than New Year's Eve, 2002, when she obtained crack-cocaine that she believed had come from

Thompson.  App. 1924

Thompson's claim that the evidence supported only a "single instance" of his crack-cocaine distribution is a severe distortion of the trial record.  Good's testimony demonstrates that on a regular basis, he "fronted" crack-cocaine to Thompson, and that Thompson would repay him upon selling the supply.  The evidence adduced at trial easily supports a rational guilty verdict.  See United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008) (finding that defendant's purchase of drugs "once or twice" on credit to be sufficient evidence of a conspiracy).  The District Court did not commit plain error by failing to disturb the conviction on the basis of insufficient evidence.

### C.  Substantive Possession Charge

Ferguson argues that the District Court erred in denying his motion for judgment of acquittal on the substantive heroin possession charge.  Specifically, he claims that the evidence presented at trial failed to demonstrate his constructive possession of the heroin found in his vehicle's center console.  The Government, Ferguson argues, established only his proximity to and knowledge of the heroin's secret location.  We disagree.

To show constructive possession, the Government was required to prove that Ferguson had both the power and intent at a given time to exercise dominion or control over the contraband.  See United States v. Garth, 188 F.3d 99, 112 (3d Cir. 1999).  "Dominion and control" refers to the "ability to reduce an object to actual possession," United States v. Martorano, 709 F.2d 863, 869 (3d Cir. 1983).  This may be proven by

11

evidence that the defendant attempted to hide or destroy the object, see United States v. Davis, 461 F.2d 1026, 1035-36 (3d Cir. 1972), but may not be proven by evidence demonstrating the defendant's mere proximity to the object, see United States v. Jenkins, 90 F.3d 814, 818 (3d Cir. 1996). Further, "dominion and control" is not exclusive; multiple individuals may exercise dominion and control simultaneously. Davis, 461 F.2d at 1035.

The evidence presented at trial, viewed in the light most favorable to the Government, allowed a rational trier of fact to conclude beyond a reasonable doubt that Ferguson exercised dominion and control over the heroin. The jury heard a recorded phone call during which Ferguson referred to his vehicle as "my Jeep," Government Supplemental Appendix ("Gov't Supp. App.") 96, and that he regularly operated it, App. 2954-55. See United States v. Iafelice, 978 F.2d 92, 97 (3d Cir. 1992) ("Ownership and operation of the car [within which drugs are found] are highly relevant facts that could reasonably have been considered by a jury in evaluating [defendant's] knowledge of, and dominion and control over, the drugs."). Further, the jury heard that Ferguson was the one who removed the heroin from the driver's-side door and hid it in the center console. Attempting to conceal an object is a type of behavior from which a jury may infer constructive possession. See Jenkins, 90 F.3d at 818 ("The kind of evidence that can establish dominion and control [over an object] includes . . . evidence that the defendant attempted to hide [the object.]").

The District Court did not err in denying Ferguson's post-trial motion for judgment of acquittal on possession with intent to distribute heroin.

12

### III. District Court's Trial Rulings

Ferguson and Thompson challenge certain evidentiary-related rulings made by the District Court during the trial.

#### A. Ferguson

#### 1. Denial of Motion In Limine

Ferguson argues that the District Court erred in denying his motion in limine to prevent former cellmate Arlando Crowe from testifying pursuant to Federal Rule of Evidence 403.[4]  Specifically, Ferguson argues (for the first time on appeal) that Crowe's testimony presented too high a risk of unfair prejudice given the District Court's failure sua sponte to hold a hearing to inquire about the Government's decision not to interview Crowe until January 27, 2006 – after the trial was already underway.  Ferguson also claims (as he did at trial) that Crowe's testimony itself – separate and apart from the circumstances surrounding it – was unduly prejudicial.

As to the District Court's failure to hold a hearing before allowing Crowe to testify, our case law does not obligate a district court to employ any particular means (such as a

---

[4] We review the District Court's resolution of motions in limine to admit or preclude evidence pursuant to Federal Rule of Evidence 403 for abuse of discretion.  See United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999).  To the extent Ferguson's arguments were not made to the District Court, we review for plain error.   Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

hearing) in order to convince itself that Rule 403's balancing test has been satisfied. Thus, the District Court's failure <u>sua</u> <u>sponte</u> to hold a hearing to probe the circumstances leading up to Crowe's testimony in performing its Rule 403 analysis was not error (much less <u>plain</u> error). In fact, the District Court <u>did</u> address the potential for Crowe's testimony to generate unfair prejudice of the type with which Rule 403 concerns itself. Namely, it instructed the jury on how to consider Crowe's self-interest in evaluating his testimony. App. 3461. And as to Crowe's testimony itself, while Ferguson asserts that it was unduly prejudicial, he fails to explain why any such prejudice was undue. We hold that the District Court did not commit reversible error in denying Ferguson's motions <u>in</u> <u>limine</u>.[5]

## 2. Rule 404(b)

Ferguson next argues that the District Court plainly erred in admitting into evidence, pursuant to Federal Rule of Evidence 404(b), a stipulation that Ferguson had been arrested in 1999 on several drug charges.[6] Specifically, Ferguson argues that the District Court's jury instruction explaining that the evidence was admissible only for the limited purpose of impeachment was substantively inadequate and was given too late.

Rule 404(b) provides:

---

[5] Ferguson's argument that the District Court's decision to deny his motion <u>in</u> <u>limine</u> on these bases violated (apart from Rule 403) his Fifth Amendment right to due process is equally meritless.

[6] We review the District Court's decision to admit evidence of Ferguson's prior criminal convictions pursuant to Federal Rule of Evidence 404(b) for plain error, because Ferguson never objected to this evidence at trial. <u>See</u> <u>Gov't of V.I. v. Archibald</u>, 987 F.2d 180, 184 (3d Cir. 1993)

14

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

If a court decides to admit evidence of prior bad acts pursuant to Rule 404(b), it must give a limiting instruction concerning the purpose for which the evidence may be used. United States v. Mastrangelo, 172 F.3d 288, 295 (3d Cir. 1999). The instruction must be evaluated "not 'in artificial isolation, but . . . in the context of the overall charge.'" United States v. Price, 13 F.3d 711, 724 (3d Cir. 1994) (quoting United States v. Park, 421 U.S. 658, 674 (1975)) (alteration in Price). The instruction need not contain any particular language, as long as it adequately prevents unfair prejudice. See United States v. Daraio, 445 F.3d 253, 265 (3d Cir. 2006). There is also no rigid rule about the timing of a limiting instruction; the focus, again, is on whether the instruction (at the time it was given and in the manner it was given) sufficed to prevent unfair prejudice. See United States v. Hakim, 344 F.3d 324, 326 (3d Cir. 2003).

The District Court did not plainly err in giving its limiting instruction. That instruction provided:

> Evidence that an act was done or that an offense was committed by a Defendant at some other time is not, of course, any evidence or proof whatever that at another time a Defendant performed a similar act or committed a similar offense,

15

including the offense charged in the superseding indictment. Evidence of a similar act or offense may not be considered by the jury in determining whether a Defendant actually performed the physical acts charged in the superseding indictment. Nor may such evidence be considered for any other purpose whatsoever unless the jury first finds beyond a reasonable doubt from other evidence in the case standing alone that the Defendant physically did the acts charged in the superseding indictment.

If the jury should find beyond a reasonable doubt from other evidence in the case that a Defendant did the act or alleged in the superseding indictment, the jury may then consider evidence as to an alleged earlier act of a like nature in determining the knowledge, intent, or motive of the Defendant.

App. at 3465. We believe that this instruction is similar, in material respects, to the one we held satisfied Rule 404(b) in Daraio:

You must not consider any of this evidence in deciding if the defendant committed the acts charged in this indictment. However, you may consider this evidence for other very limited purposes.

If you find beyond a reasonable doubt from the other evidence in this case, that the defendant did commit the acts charged in the indictment, then you may consider the evidence of similar acts allegedly committed on other occasions, to determine, one, whether the defendant had the intent necessary to commit the crime charged in the indictment; two, whether the defendant had the motive to commit the act charged in the indictment; or, three, whether the defendant willfully committed the acts for which she is on trial, or rather committed them by accident, negligence, or mistake.

445 F.3d at 257. That instruction survived abuse-of-discretion review. Id. at 259 (indicating use of abuse of discretion standard of review of district court's Rule 404(b) ruling). The one given by the District Court here, then, comfortably survives our more deferential plain error review.

The District Court also did not plainly err in giving this instruction at the close of

16

trial rather than at the time the evidence was introduced. In our view, the lapse of time was not long enough to overcome the presumption that the jury follows the court's instructions. See Hakim, 344 F.3d at 326; see also United States v. Fraser, 448 F.3d 833, 843 n.4 (6th Cir. 2006) (holding that delayed limiting instruction was not error); United States v. Misle Bus & Equipment Co., 967 F.2d 1227, 1234 (8th Cir. 1992) (holding that delayed limiting instruction does not amount to abuse of discretion).

## B. Thompson

### 1. Sixth Amendment Challenge

By the time of the second trial, Government witnesses Gary Sloan and Raymond Moon had already received reduced sentences, pursuant to plea agreements, for their cooperation in the case. At trial, Thompson sought to cross-examine Sloan and Moon by eliciting their possible incentive to give false testimony based on their plea agreements and expectation of receiving reduced sentences. Thompson also requested that the District Court preclude the Government from adducing evidence of Sloan and Moon's actual sentence reductions to avoid intimating that the witnesses had earned reduced sentences by telling the truth. In other words, defense counsel was concerned that if the jury learned that the District Court had reduced the witnesses' sentences, it might believe that the court had given its imprimatur on the veracity of their testimony. The District Court denied the latter request. It gave Thompson the option of either: (1) allowing the Government to elicit testimony of the sentence reductions if he wished to challenge the witnesses' bias based on

17

the plea agreements; or (2) foregoing inquiry into plea agreements altogether. Thompson chose the latter option, and now argues that the District Court violated his rights under the Sixth Amendment.[7]

The Confrontation Clause secures the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. By now it is axiomatic that inquiry into a witness's motivation to testify – especially a cooperating witness testifying pursuant to a plea agreement with the Government – "is the principal means by which the believability of [the] witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). It is equally well settled, however, that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) ("the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (emphasis in original).

Had the District Court prohibited outright all inquiry into Sloan's and Moon's plea

---

[7] We review the District Court's limitation on Thompson's ability to cross-examine Sloan and Moon for an abuse of discretion; if we find such an abuse, we then must ask whether the abuse was harmless. United States v. Lore, 430 F.3d 190, 208 (3d Cir. 2005).

agreements, the ruling unquestionably would have run afoul of the Confrontation Clause.
See Van Arsdall, 475 U.S. at 679 ("By . . . cutting off all questioning about an event that . . . a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated . . . the Confrontation Clause.").  Of course, the District Court did not so rule, but instead posed to Thompson a choice between: (1) permitting the Government to elicit testimony from the witnesses that they had already received reduced sentences, if Thompson wished to probe the witnesses' possible bias regarding their plea agreements; and (2) foregoing inquiry into the plea agreements altogether.  While Thompson ultimately opted not to pursue it, we will review the less restrictive – the first – option to determine if the District Court unduly limited Thompson's overall ability to cross-examine Sloan and Moon as to bias.  If the option itself comports with the Sixth Amendment, Thompson's considered decision not to select it cannot be assailed as the fault of the District Court.  We hold that the District Court did not abuse its discretion, and that the choice it posed to Thompson satisfied the Sixth Amendment.

In United States v. Chandler, two cooperating witnesses testified that they expected to receive reduced sentences in exchange for their testimony, but the district court did not permit the defendant to inquire about how much time the witnesses would have been facing absent their cooperation.  326 F.3d 210, 222 (3d Cir. 2003).  As we explained, this amounted to a significant limitation on the defendant's right to examine the witnesses' motive for testifying because their "mere acknowledgment that [they] hoped that the

19

government would move for a lesser sentence did not adequately enable a jury to evaluate [their] motive to cooperate." Id. We set out the following test for challenges to a district court's limitation on cross-examination:

> First, we must determine whether that ruling significantly inhibited Chandler's effective exercise of her right to inquire into either witness's "motivation in testifying"; and second, if the District Court's ruling did significantly inhibit Chandler's exercise of that right, [we must determine] whether the constraints it imposed on the scope of Chandler's cross-examination fell within those "reasonable limits" which a trial court, in due exercise of its discretion, has authority to establish.

Id. at 219. We continued in pertinent part:

> With respect to the cross-examination of cooperating witnesses who expect to obtain, or have obtained, a benefit from the government in exchange for their testimony, the "critical question . . . is whether the defendant is allowed an opportunity to examine a witness [sic] 'subjective understanding of his bargain with the government,' 'for it is this understanding which is of probative value on the issue of bias.'"

Id. at 220 (citation omitted, alterations in original).

The first option posed by the District Court in this case in no way limited the scope of defense counsel's inquiry into Sloan and Moon's potential motivation to lie.[8] Thompson

---

[8] Thompson argues that the first option limited his constitutional right to cross-examine Sloan and Moon because introduction of their reduced sentences "absolutely would have resulted in improper vouching for the credibility of the witnesses." Thompson Br. at 26. We disagree. Vouching occurs when two criteria are met: "(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record." United States v. Harris, 471 F.3d 507, 512 (3d Cir. 2006) (quoting United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998)). Upon discussing the issue with counsel, the District Court clearly understood the dilemma Thompson faced, and emphasized to the Government its desire "to make sure that the

would have been free to question Sloan and Moon on the sentences they faced without the plea agreements, squarely within <u>Chandler</u>'s holding. The District Court simply conditioned Thompson's inquiry on the preservation of the Government's right to convey the entire account. According to the Government, any incentive to lie that Sloan and Moon might have had in order to curry favor with the prosecutor arguably vanished when they were sentenced. App. 651. Therefore, the Government argues, if Thompson was permitted to elicit testimony tending to demonstrate the witnesses's ulterior motives, then the Government should have been allowed to rebut such a claim. We agree.

In essence, Thompson asks us to interpret <u>Chandler</u> such that he had a constitutional right to challenge Sloan and Moon's motivation to testify <u>and</u> simultaneously to hamstring the Government from rebutting such a challenge. But neither <u>Chandler</u> nor any of the cases upon which it rests provide authority for such a right. A defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." <u>Chandler</u>, 326 F.3d at 222 (quoting <u>Van Arsdall</u>, 475 U.S. at 680). The District Court prescribed no such prohibition, and Thompson's claim therefore fails.[9]

prosecutor doesn't try to use the fact that the judge has made a determination that they're believable so [the jury] should believe them." App. 651-52. The prosecutor responded, "I won't make that argument, Your Honor." <u>Id.</u> In light this stipulation, we will not speculate that the prosecutor would nonetheless have used Sloan and Moon's sentences to personally assure the jury of their credibility.

[9] We note that, even if we were to find that the District Court's choice violated the Confrontation Clause, we would hold the error harmless in light of the overwhelming

21

## 2. Preclusion of Good's Recorded Telephone Calls with Means

Thompson next argues that the District Court erred in refusing to allow him to play for the jury recorded conversations between his daughter, Monique Means, and Good. The calls demonstrated that before his arrest, Good had engaged in a secret sexual relationship with Means. Such evidence, Thompson says, would have demonstrated more clearly Good's bias against him. The District Court granted the Government's motion in limine to preclude admission of the calls, subject to Good's acknowledgment of the sexual relationship with Means. App. 1429. The District Court did, however, rule that Good's relationship with Means was an appropriate line of inquiry, and both the Government and defense counsel questioned Good about the relationship. App. 1433-34, 1445-47. Thompson now claims that he should have been permitted to play the calls for the jury.[10]

weight of the evidence proffered against Thompson. See Lore, 430 F.3d at 208.

[10] The nature of Thompson's challenge is unclear. He avers that under Rules 401 and 402 of the Federal Rules of Evidence, the recordings were relevant evidence of Good's bias, Thompson Br. at 31, and then intimates that the District Court erred in a Rule 403 analysis by finding that the inflammatory nature of the calls outweighed their probative value, id. at 34. The District Court instead conducted the two-part constitutional analysis set forth in Chandler, supra, although in doing so it necessarily weighed the relative prejudice of the tapes against their probative value. The Government assumes that the Chandler framework properly applies here, where the "limitation" was the preclusion of audio evidence possibly related to Good's bias. We note that the issue in Chandler (as it was in Van Arsdall, upon which Chandler relied) was the actual "curtailment of [a defendant's] inquiry" into a witness's possible bias, rather than the refusal to admit extrinsic evidence that might complement such an inquiry. See 326 F.3d at 217-19, 223. We understand the nature of Thompson's challenge to be evidentiary rather than constitutional. Indeed, Thompson cites three cases, none of which concerns the Confrontation Clause. See Thompson Br. at 31-33. And while the Government characterizes the District Court's ruling as affecting "the interplay between cross

22

We will accept Thompson's argument that the recorded calls between Good and Means were relevant to Good's bias, see Fed. R. Evid. 401, 402, and will proceed directly to the District Court's rationale for excluding them from the jury. As part of its analysis under Chandler, the District Court discussed the effect the tapes had on Good at the first trial: "[T]he Court has preliminarily advised the parties that . . . [it] would not permit the conversations to be played because the conversations . . . in the prior case . . . clearly affected the witness Michael Good, it caused him to be very agitated, concerned and he took that as a form of harassment . . . ." App. 1416. The District Court continued: "[s]o, in order to minimize the prejudicial effect, which the Court recognizes does occur because of the incestuous nature of the sexual relationship that would be coming out and . . . that could have the potential to affect the jury, the Court w[ill] not permit the conversations to be played . . . ." App. 1417. The District Court concluded as follows:

> I'm not going to permit the – unless Michael Good denies the relationship, I will not permit the conversations to be played. . . . [T]he tapes cannot be played because I think they are more inflammatory and they go more to harassing the defendant. I think what is important is for the defendant to be able to probe this line of inquiry, but I am going to impose those restrictions which I believe fall within the reasonable limits that a district court has the authority to impose, and

---

examination for motive and [the] reasonable limitation thereupon," Gov't Br. at 53, the parties agree that the District Court did not limit the scope of Thompson's inquiry into Good's relationship with Means, but simply denied the admission of extrinsic evidence relating to such an inquiry. We will therefore analyze the claim under the familiar balancing test required by Rule 403. See Eufrasio, 935 F.2d at 571. Whether falling under the aegis of Chandler or the Federal Rules of Evidence, however, we review the District Court's refusal to play the recorded calls for abuse of discretion, see United States v. Jimenez, 513 F.3d 62, 76 (3d Cir. 2008), and we find none.

that would be for purposes of harassment, which would be the playing of the tapes . . . .

App. 1428-29.

Thompson argues that the District Court erred by precluding admission of the calls because the calls not only demonstrated the existence of Good's relationship with Means, but also themselves demonstrated the extent of Good's bias against him. Because, Thompson says, Good expressed his desire to keep the relationship secret during the calls, the substance of the calls demonstrated Good's motivation to assist the Government in its case against Thompson (thus allowing Good to continue his relationship with Means uninterrupted). Whether this was so (and we have serious doubts that it was), we have steadfastly held that "if judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." United States v. Long, 574 F.2d 761, 767 (3d Cir. 1978). "Because the trial judge is present in the courtroom as the challenged evidence is offered, and is therefore in the best position to assess the extent of the prejudice caused a party, the trial judge must be given a very substantial discretion in balancing probative value on the one hand and unfair prejudice on the other." United States v. Universal Rehabilitation Servs., 205 F.3d 657, 665 (3d Cir. 2000) (citations and quotation marks omitted).

Accordingly, we "accord great deference" to the District Court's decision, mindful that "in order to justify reversal, a district court's analysis and resulting conclusion [concerning the probative value or prejudicial effect of the challenged evidence] must be

24

'arbitrary or irrational.'" Id. (quoting In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 453 (3d Cir. 1997)). As its discussion set forth above demonstrates, the District Court's determination that playing the calls to the jury would have been more prejudicial than their relative probative value was neither arbitrary nor irrational. We hold, therefore, that it was not an abuse of discretion.

## IV. Prosecutorial Misconduct

Ferguson argues that the Government committed prosecutorial misconduct and that the District Court committed plain error by failing to declare a mistrial.[11] We disagree.

### A. Summation Remarks

Ferguson first argues that the prosecutor made an improper remark in his summation. A litigant making a prosecutorial misconduct claim based on an allegedly improper summation faces a decidedly uphill journey. "The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." United States. v. Werme, 939 F.2d 108, 117 (3d Cir.

---

[11] Ferguson appears to argue that we should review those prosecutorial misconduct arguments that he "brought to the district court's attention" but to which he did not formally object for abuse of discretion rather than plain error. See Ferguson Br. at 46. We disagree and will apply plain error review. See United States v. Ehrmann, 421 F.3d 774, 783-84 (8th Cir. 2005) (holding that plain error review – and not abuse of discretion review – applies to allegation of prosecutorial misconduct brought to district court's attention yet not formally objected to) (citing Johnson v. United States, 520 U.S. 461, 466-67 (1997); United States v. Boyd, 180 F.3d 967, 983 (8th Cir. 1999)); see also United States v. Irizarry, 341 F.3d 273, 306 (3d Cir. 2003). We note, however, that we would reach the same result under an abuse of discretion standard.

1991) (rejecting due process challenge to remarks in summation). "The prosecution may 'ask the jury to draw permissible inferences from anything that appears in the record.'" United States v. Sullivan, 803 F.2d 87, 91 (3d Cir. 1986) (quoting Oliver v. Zimmerman, 720 F.2d 766, 770 (3d Cir. 1983) (per curiam)).

The prosecutor did not act improperly when he characterized Thompson's statement to imply that, had Ferguson resisted the police's request to search his automobile, "he would still be out here with us [co-defendant Roscoe Thompson and Good] dealing drugs." App. 3541. Thompson and Good, in the conversation at issue, were lamenting Ferguson's lack of resistance to the police's request to search his vehicle. They agreed that, had either of them been in Ferguson's place, they would have refused the search. Had Ferguson done so, Thompson said, "he['d] be out there bullsh---ing with us" as a free man. Gov't Supp. App. 110. Given the ample unchallenged record evidence linking Ferguson to Good's drug ring, see, e.g., App. 1126-27; 2409-10; 1843, the jury reasonably could have interpreted the statement that Ferguson would be "out there bullshi---ing" with Good and Thompson as a free man to mean that Ferguson would be participating in drug-related activities with Good and Thompson. Therefore, the prosecutor's statement did not amount to misconduct. See Werme, 939 F.2d at 117. The District Court did not plainly err in failing to declare a mistrial on this basis.

### B. Good-Faith Basis to Question

Second, Ferguson argues that the prosecutor questioned a defense witness without a

good-faith basis. "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir. 1983). The district court has no obligation to declare a mistrial, though, when it objectively appears to the district court that defense counsel has satisfied itself that the prosecutor has demonstrated good faith. See United States v. Cudlitz, 72 F.3d 992, 1001 (1st Cir. 1996). Further, as a general matter, the district court "enjoys great latitude in deciding whether a good faith basis [for a prosecutor's question] exists." Id. (citing United States v. Ovalle-Marquez, 36 F.3d 212, 219 (1st Cir. 1994)).

The prosecutor did not act improperly when he asked Frederick Neal, who for a time was housed near Ferguson in prison, about whether he remembered having a conversation with Ferguson earlier that morning. Specifically, the prosecutor asked Neal whether, during the purported conversation, Ferguson "told you, remember, this is what your story needs to be." App. 2813. Neal testified that he did not recall such a conversation. Id. Immediately thereafter, during a recess, Ferguson's counsel told the court:

> Your Honor, when [the prosecutor] was done, I walked over and I asked him, because I presumed he asked that question in good faith, because, obviously, if he didn't I was going to ask it be stricken and he'd be admonished for doing something like that. And he informed me he did have a good faith basis for that. I, unfortunately, presume I'm going to see a witness who will testify probably exactly to what he asked.

App. 2814. The prosecutor indicated that a rebuttal witness would indeed be forthcoming.

27

App. 2814-15. Ferguson later admitted to having a conversation with Neal (but testified that he did not remember its substance). App. 3175-76. On rebuttal, a United States Marshal testified that, after that recess, Ferguson asked him, "are you the one that ratted me out?" App. 3370.

The prosecutor provided exactly what defense counsel appears to ask for: rebuttal testimony tending to indicate that the prosecutor's question had a basis in fact. The Marshal's testimony regarding Ferguson's negative reaction to the question posed to Neal is competent proof that the prosecutor had a good-faith basis to probe any directive that Ferguson might have given Neal before his testimony. Thus, we find that the District Court did not plainly err – and did act within its "great latitude," Cudlitz, 72 F.3d at 1001 (citing Ovalle-Marquez, 36 F.3d at 219) – in declining to declare a mistrial on this ground.

## V. Sentencing Issues

Ferguson and Thompson also challenge their sentences as unreasonable. We have thoroughly reviewed the transcripts of the sentencing proceedings, as well as the sentences themselves. We discern no reason to disturb the sentences, and will reject the challenges without further discussion.

## VII. Conclusion

We will affirm the District Court's judgments in these appeals in all respects.