NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4084
_____

UNITED STATES OF AMERICA

v.

TROY LEAKE,
a/k/a Troy Jones,
                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 07-cr-00655)
District Judge:  Hon. Peter G. Sheridan
_____

Submitted Under Third Circuit LAR 34.1(a)
October 6, 2010

Before:   JORDAN, ALDISERT, and ROTH, *Circuit Judges*.

(Filed: October 8, 2010)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Troy Leake appeals from a judgment of conviction and sentence entered by the

United States District Court for the District of New Jersey following his conviction for

unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Because there was no error in the challenged rulings, we will affirm.

## I. Background

On April 5, 2007, around midnight, Sergeant Thomas Ruane and Officer David Golpe (collectively "the officers") of the Newark Police Department were patrolling a high crime area of Newark, New Jersey, in a marked police car, with Sergeant Ruane driving and Officer Golpe in the passenger seat. As the officers traveled west on Sussex Avenue they noticed Leake, who was by himself and walking towards them on the opposite side of the street near the southwest corner of Sussex and 5th Street with his right hand positioned on his right hip, apparently holding something. As the officers drove closer, each eventually could see that Leake was carrying a gun, which prompted them to stop their patrol car and order Leake to drop the gun. In response, Leake told the officers that he did not have a gun, and began to run away.

Officer Golpe got out of the police car and chased Leake on foot, while Ruane drove after Leake in the patrol car. Ruane quickly realized that the patrol car was unnecessary, however, because Leake seemed to be intoxicated and was running very slowly; therefore, he stopped the patrol car and began chasing Leake on foot with Officer Golpe. The chase ended half a block later when Leake tripped on the curb of a sidewalk and dropped a silver revolver. When the officers arrived at Leake's position, Leake refused to be handcuffed, forcing Sergeant Ruane to begin wrestling with Leake's hands

2

and arms. During the struggle, the officers noticed that Leake had another firearm in the waistband of his pants. Leake reached for that gun, and Sergeant Ruane struck him and then succeeded in handcuffing him.

The guns Leake was carrying were a .38 caliber Smith & Wesson revolver, loaded with five rounds of .38 caliber ammunition, and a .357 magnum Ruger pistol with a defaced serial number, loaded with three ball-tipped and two hollow point bullets.

A.      *Leake's Motion to Suppress*

On August 6, 2007, Leake was charged in a one-count indictment with illegal possession of ammunition and firearms, in violation of 18 U.S.C. § 922(g)(1). On March 7, 2008, Leake filed a motion to suppress, arguing that "since [he] was illegally searched and seized, absent any reasonable suspicion that criminal activity was afoot or probable cause to believe that he had committed a crime, any evidence obtained as a result of that search and seizure is inadmissible." (JA at 14.) Leake also offered his version of the events leading up to his arrest in a sworn affidavit claiming:

> 2. Late in the evening of April 4, 2007, I was walking along near the corner of Sussex and North 5th Street in Newark, New Jersey.
>
> 3. I was walking home by myself, minding my own business. I was not yelling, fighting, or engaged in any sort of criminal activity.
>
> 4. While I was walking, I was not holding a small silver gun in my hand, nor was there anything protruding from underneath my clothes. A person looking at me would not have seen a gun in my hand or protruding from my clothes.

3

5. A police officer approached me and struck me to the ground with a gun and the officers then searched me.

(JA at 28.)

On November 17, 2008, the District Court held a hearing on Leake's motion and heard testimony from Sergeant Ruane and Officer Golpe. In most respects, Sergeant Ruane and Officer Golpe offered similar accounts of the events leading up to Leake's arrest. Both testified that they were on patrol when they noticed Leake walking alone around midnight in a high crime area; that upon approaching Leake, they saw a gun on Leake's right hip; and that when they stopped their patrol car and ordered Leake to drop the gun, Leake refused to drop the weapon and instead ran until he was ultimately apprehended by the officers. However, Leake argued that neither of the officers were credible due to "[i]nconsistencies and implausibilities about what they saw, where they were in relation to Mr. Leake, and the events as they unfolded." (JA at 60.)

Most of the discrepancies cited by Leake pertained to the officers' attire on the night of the arrest, their initial reason for approaching Leake, and whether they saw Leake holding the firearm when they approached him in their patrol car or whether it was merely on his hip. With respect to the officers' attire, Sergeant Ruane testified that, on the night of Leake's arrest, he and Officer Golpe were on patrol in a marked police vehicle and that he was dressed in plain clothes. Officer Golpe also recalled being in a marked police vehicle, but he could not recall whether he and Sergeant Ruane were in uniform or in

4

plain clothes and thought that they would have been in uniform due to the fact that they were in a marked police vehicle.

Both officers testified that they decided to approach Leake prior to seeing that he had a gun, but each officer indicated different reasons for doing so. Sergeant Ruane testified that he became suspicious of Leake even before seeing that he had a gun, due to the manner in which Leake was walking down the street:

> ... while we were driving closer to him, we see his right arm on his hip area, left arm swinging. Due to my experience recovering guns from individuals and narcotics, very suspicious activity, a lot of people guard the weapon or the narcotics that way. As we drove closer we see it's a gun, gun in his hand. At which time, we pulled up, got out of our car; police, drop the gun. He started running.

(JA at 93.) On the other hand, Officer Golpe did not mention the manner in which Leake was walking down the street and explained his reason for wanting to question Leake as follows:

> A: Initially we saw Mr. Leake walking. He was the only person there. We like to challenge people walking around at 12 clock at night doing absolutely nothing per se or wandering. It's a drug area, city of Newark. Lot of shootings, killing. So we challenge people. Lot of times we see somebody walking we pull up, hey, what's going on?
>
> Q: You approach them, try to talk to them?
>
> A: Correct.
>
> Q: Is that what you did here?
>
> A: That's what we initially started to do as we was coming down to see where he was coming from. Prior to ever stopping, saying anything to him as we were pulling up, that's when we saw the gun.

5

Q: So it was your intention to stop and challenge him as you say?

A: Yeah. It would have been my intention to take a look at him, see what he was doing.

(JA at 149.)

Finally, Sergeant Ruane testified on direct examination that he saw a gun on Leake's right hip. On cross-examination, however, Sergeant Ruane testified that he also saw Leake holding the gun. Officer Golpe also recalled seeing the gun near Leake's right hip. However, unlike Sergeant Ruane, Officer Golpe never actually saw Leake holding the gun.

On January 23, 2009, the District Court denied Leake's motion to suppress. In doing so, the Court rejected Leake's argument that Sergeant Ruane and Officer Golpe were not credible, finding that the discrepancies in their testimony were "minor" and "have little bearing, if any, on the ultimate facts adduced at the hearing," namely, that "the officers were on patrol when they noticed Defendant walking alone at midnight; that upon approaching the Defendant, the officers saw a gun on Defendant's right hip; and that Defendant, when stopped, refused to drop the weapon and instead ran until he fell and was ultimately apprehended by Ruane." (JA at 86.) After crediting the officers' testimony, the Court held that "[o]nce the officers approached and saw the firearm in [Leake's] hand, they had, at the very least, a reasonable and articulable suspicion sufficient to perform a *Terry* stop." (*Id.*)

6

B.    *Trial Testimony Regarding "Hollow-Point" Bullets*

On June 2, 2009, Leake proceeded to trial.  During the government's case-in-chief, Sergeant Ruane testified that one of the guns recovered from Leake on the night of his arrest was loaded with two hollow-point bullets.  Leake's counsel objected to the line of questioning, arguing that "[i]t's not a relevant element of the case." (JA at 173.)  The District Court overruled the objection, stating "[r]elevance is as to the weapon.  I'll allow it." (*Id.*)  Golpe also testified about the hollow-point bullets and explained the difference between hollow-point and bald-point bullets as follows: "Hollow point is designed to expand, or more commonly referred to in the media as the cop-killer bullets." (JA at 219-20.)  Leake's counsel objected and also moved for a mistrial based on Officer Golpe's testimony about "cop-killer bullets."  The District Court overruled the objection and declined to grant a mistrial.  The Court offered to give the jury a curative instruction, but Leake's counsel declined the offer.  On June 3, 2009, the jury returned a verdict of guilty.

C.    *Sentencing*

The United States Probation Office prepared a presentence investigation report, which calculated Leake's sentencing range at 97 to 121 months of imprisonment.  However, due to the statutory maximum term of 10 years set forth in 18 U.S.C. § 922, the sentence was capped at 120 months of imprisonment.  The advisory range was based on a criminal history category of III and a total offense level of 28, which was composed of a

base offense level of 24 and a four-level enhancement under U.S.S.G. § 2K2.1(b)(4) for possessing a firearm with an obliterated serial number.

Leake objected to the enhancement, arguing that "[it] is unsound because the Commission never explained how it advances the purposes of sentencing, and much evidence shows it does not" (JA at 332-33), and because, unlike 18 U.S.C. § 922(k), which criminalizes the knowing possession of a firearm with an obliterated serial number, § 2K2.1(b)(4)(B) contains no mens rea element. Thus, Leake claimed that:

> This enhancement is ... "criminaliz[ing] activity on the cheap." *See United States v. Grier*, 475 F.3d 556, 574 (3d Cir. 2006) (Rendell, J., concurring). Possessing a firearm with an obliterated serial number is an independent criminal offense, pursuant to 18 U.S.C. § 922(k). In order to prove this offense, the government would have to establish beyond a reasonable doubt not only knowing possession of the firearm but also knowledge that the serial number had been obliterated. *See United States v. Haywood*, 363 F.3d 200, 206 (3d Cir. 2004).
>
> The guidelines, on the other hand, permit Mr. Leake's offense level to be enhanced by four levels based on a showing by a mere preponderance of the evidence of the fact that the serial number was obliterated. Absent a more compelling explanation from the Commission that this dramatic increase in the enhancement was implemented through an exercise of its characteristic institutional role, this specific enhancement is entitled to little deference as a useful measure of the minimally sufficient sentence.

(JA at 332-34.) The District Court rejected Leake's argument and applied the enhancement, relying on § 2K2.1 commentary note 8(B), which states that "[s]ubsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm ... had an altered or obliterated serial number." Accordingly, on October 5, 2009,

8

the District Court sentenced Leake to 97 months of imprisonment, to be followed by three years of supervised release. On October 16, 2009, Leake filed a timely notice of appeal.

## II.    Discussion[1]

On appeal, Leake argues that the District Court erred in denying his motion to suppress, allowing testimony that one of the guns recovered from Leake was loaded with "hollow-point bullets," and failing to grant a mistrial following Officer Golpe's testimony about "cop-killer bullets." Leake also contends that the District Court erred in calculating his sentence by applying § 2K2.1(b)(4)'s enhancement for possessing a firearm with an obliterated serial number. We address each of Leake's arguments in turn.

### A.    *Leake's Motion to Suppress*

"[We] review[] the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Here, the facts leading up to Leake's arrest, as described by the officers and credited by the District Court, reveal that Leake was carrying a firearm in plain view. We conclude that the District Court's account of the evidence is plausible at the very least. *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("If the district court's account

---

[1]The United States District Court for the District of New Jersey had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

of the evidence is plausible in light of the record viewed in its entirety, we will not reverse it even if, as the trier of fact, we would have weighed the evidence differently.") (internal citations omitted); *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 137 (3d Cir. 2009) ("[w]e review credibility determinations, like other factual findings, under a clearly erroneous standard. ... This review is more deferential with respect to determinations about the credibility of witnesses") (internal citations omitted). The majority of Sergeant Ruane's and Officer Golpe's recollections of the events leading up to Leake's arrest were consistent. Both officers testified that they were on patrol when they noticed Leake walking alone around midnight in a high crime area; that upon approaching Leake, they saw a gun on Leake's right hip; and that when they stopped their patrol car and ordered Leake to drop the gun, Leake refused to drop the weapon and instead ran until he was ultimately apprehended by the officers. Further, we agree with the District Court that any discrepancies in the officers' testimony are minor and have little, if any, bearing on the ultimate issues. Thus, we reject Leake's argument that the District Court clearly erred in accepting the officers' version of the events associated with the arrest.

We also disagree with Leake's assertion that the District Court erred in applying the governing law to the facts. Pursuant to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion

10

that criminal activity is afoot." *United States v. Williams*, 413 F.3d 347, 351 (3d Cir. 2005) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The Supreme Court has also held that an officer may conduct a reasonable search for weapons when:

> [The officer] has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Terry v. Ohio*, 392 U.S. 1, 27 (1968). In light of the foregoing, Sergeant Ruane and Officer Golpe clearly had, at the very least, a reasonable and articulable suspicion sufficient to conduct a *Terry* stop once they approached Leake and observed that he had a firearm.

Finally, it is of no consequence that Officer Golpe wanted to approach Leake and question him, even before the officers saw that Leake was carrying a gun. *United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search ... provided they do not induce cooperation by coercive means.").

B.     *Admission of Testimony Regarding "Hollow-Point" Bullets*

We review the District Court's evidentiary rulings for abuse of discretion. *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). With respect to evidentiary determinations made under Federal Rule of Evidence 403, we have

11

said that "we owe the District Court very substantial discretion in its ruling on whether to admit testimony under Rule 403," and that "a district court's balancing under Rule 403 will only be reversed if its analysis and conclusions are arbitrary or irrational." *United States v. Diaz*, 592 F.3d 467, 475 (3d Cir. 2010) (internal citations omitted).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 401's definition of relevance is "very broad" and "does not raise a high standard." *Gibson*, 355 F.3d at 232. However, even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

According to Leake, because "the government opted to prosecute [him] for firearms possession," (Appellant's Op. Br. at 36), the only facts of consequence in his prosecution were "whether [he] (1) possessed a firearm (2) after previously having been convicted of a felony." (*Id.*) Accordingly, he argues that the District Court erred in allowing Sergeant Ruane and Officer Golpe to testify about the hollow-point bullets because "[e]vidence regarding the nature of the bullets adds nothing to the jury's determination of the issues before it, it is not necessary for the government to prove its

case, and it serves no purpose other than to inflame and to prejudice the jury, which violates Rule 401 and Rule 403 of the Federal Rules of Evidence." (*Id.* at 34.)

Contrary to Leake's assertion that the government opted to prosecute him solely for possession of firearms, he was actually charged under § 922(g)(1) with possession of firearms and with possession of ammunition. And while the simultaneous possession of a firearm and ammunition can only support one conviction and sentence under § 922(g)(1), *United States v. Tann*, 577 F.3d 533, 537 (3d Cir. 2009), a defendant may be convicted under § 922(g)(1) for possessing either. 18 U.S.C. § 922(g)(1) (providing that "[i]t shall be unlawful for any person ... who has been convicted ... of a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition"). Thus, evidence of ammunition was certainly relevant, and the District Court did not abuse its discretion in allowing Sergeant Ruane and Officer Golpe to testify that they found bullets in the firearms Leake was carrying. It is a closer question whether the specific type of ammunition was relevant and whether, if relevant, it was admissible under Rule 403. Even assuming, however, that the District Court should have sustained an objection to the testimony about the type of bullets, any error was clearly harmless in the face of the overwhelming evidence of Leake's guilt.

C.    *Leake's Motion for a Mistrial*

"We review the denial of a motion for a mistrial based on a witness's allegedly prejudicial comments for an abuse of discretion." *United States v. Lore*, 430 F.3d 190, 207 (3d Cir. 2005) (citations omitted).

When analyzing a motion for mistrial, "[o]ur inquiry focuses on whether any conduct at trial was so prejudicial that defendant was deprived of a fundamental right." *United States v. Xavier*, 2 F.3d 1281, 1285 (3d Cir. 1993). We have set forth the following three factors to guide our analysis: "(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court." *Lore*, 430 F.3d at 207.

Leake argues that the District Court erred in failing to grant a mistrial because "[t]he testimony about 'cop killer' bullets was so prejudicial a mistrial was required." (Appellant's Op. Br. at 38.) We disagree. Officer Golpe's single statement that hollow-point bullets are "more commonly referred to in the media as the cop-killer bullets," obviously does not amount to pronounced and persistent remarks, *Lore*, 430 F.3d at 207 ("a single statement by a witness ... hardly can be deemed pronounced and persistent"), and, as already noted, the record contains overwhelming evidence of Leake's guilt, including the eyewitness testimony of two police officers that Leake was carrying two firearms, which were both recovered during the arrest. In addition, the District Court

14

offered to issue a curative instruction, which Leake declined. *See United States v. Smith*, 487 F.3d 618, 622 (8th Cir. 2007) (holding that the district court did not abuse its discretion in denying the motion for a mistrial where the defendant had declined the district court's offer to give a curative instruction to the jury). Thus, in light of the strength of the other evidence presented at trial against Leake and the District Court's offer to give a curative instruction, we cannot say that the District Court abused its discretion in declining to grant a mistrial based on Golpe's single statement that hollow-point bullets are more commonly known in the media as "cop-killer" bullets.

D. *Sentencing Enhancement for Obliterated Serial Number on Firearm*

We review the criminal sentence imposed by the District Court in two stages. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). First, we "ensure[] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Id.* Second, "if a district court's procedure passes muster, we then ... consider its substantive reasonableness," which "requires us not to focus on one or two factors, but on the totality of the circumstances." *Id.*(internal citation omitted). "At both stages of our review, the party challenging the sentence has the burden of demonstrating unreasonableness," and "[t]he abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries." *Id.*

Section 2K2.1(b)(4)(B) of the Sentencing Guidelines provides that "if any firearm ... had an altered or obliterated serial number, increase by 4 levels." Commentary note 8(B) states that "[s]ubsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm ... had an altered or obliterated serial number." Here, Leake does not argue that the District Court erred in calculating his Guidelines range by misconstruing § 2K2.1(b)(4) or failing to apply the Guideline enhancement as written. Rather, Leake's argument is that "[t]he obliterated-serial number enhancement should not apply ... because the enhancement is unsound and not based on proper research and policy" (Appellant's Op. Br. at 41) and because, in Leake's view, "the lack of a mens rea requirement is problematic, in that an individual faces a major sentencing increase without any real evidence that he knew that a serial number was defaced, much less any proof that he was responsible for the obliteration." (*Id.* at 25.)

Leake further argues that "[t]he district court had the authority to consider these policy based arguments ... under *Kimbrough v. United States*, 552 U.S. 85 (2007)," and erred by failing to give "serious consideration [to] [his] arguments" and by employing a "strict focus on the language of the guideline provision." (Appellant's Op. Br. at 42.) However, "a district court is not required to engage in 'independent analysis' of the empirical justifications and deliberative undertakings that led to a particular Guideline." *United States v. Lopez-Reyes*, 589 F.3d 667, 671 (3d Cir. 2009); *see also United States v. Aguilar-Huerta*, 576 F.3d 365, 368 (7th Cir. 2009) ("[A judge] should not have to delve

16

into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline."); *United States v. Duarte*, 569 F.3d 528, 530 (5th Cir. 2009) ("*Kimbrough* does not force district or appellate courts into a piece-by-piece analysis of the empirical grounding behind each part of the sentencing guidelines."). Therefore, regardless of the merits of Leake's claim, the District Court did not err, much less abuse its discretion, in applying the Guideline enhancement as written.

## III. Conclusion

For the foregoing reasons, we will affirm the judgment of conviction and sentence entered by the District Court.